[No. D004552. Fourth Dist., Div. One. Oct. 26, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
TERENCE BOTHUEL, Defendant and Appellant.

COUNSEL

Charles L. McKinstry, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, William M. Wood and Randa McDaniel Trapp, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WIENER, Acting P. J.**—Defendant Terence Bothuel appeals after a jury found him guilty on six counts of various sex crimes involving the alleged

molestation of his daughter, D.[1] His principal contention involves the trial court's admission of extensive psychiatric testimony concerning the child sexual abuse accommodation syndrome (CSAAS). Although the scope of the CSAAS testimony introduced by the prosecution exceeds the parameters recently enunciated by this court in *People* v. *Bowker* (1988) 203 Cal.App.3d 385 [249 Cal.Rptr. 886], we conclude it is unlikely the over-breadth of the testimony reasonably contributed to the result. We also reject Bothuel's remaining contentions and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

D. was five years old when her parents, Terence and Laurie Bothuel, moved into the Mountain View Apartments in February 1984. During this time, Laurie worked nights as a nursing assistant and Terence stayed home to care for D. and her infant brother. D. testified that her father allowed her to watch the Playboy cable channel while her mother was at work. She explained that Terence used his hands and "weenie" to touch her vaginal, naval and rectal areas as well as her nipples and mouth. She also stated that her father gave her a "marriage kiss" all over her body. D. described a "marriage kiss" as "one of those real long kisses."

D. first told her mother about the alleged molestations in early September 1984.[2] The Bothuels were having marital difficulties at that time. On September 23, apparently in response to verbal and emotional abuse, Laurie moved out of their apartment and into the Battered Women's shelter. In answer to Laurie's inquiries, D. repeated her allegations at the shelter. Laurie then contacted the police who interviewed D. on September 29. During the hour-and-a-half interview, D. changed the details of her story a number of times and also told the detectives she had had sex with strange men in the neighborhood. Near the end of the interview, after being reminded of the importance of telling the truth and informed about the seriousness of her allegations, D. admitted she had made up the entire story. After additional questioning, the detectives concluded there was no basis for pursuing the matter further.

---

[1] Bothuel was found guilty on three counts of violating Penal Code section 288, subdivision (a) (lewd acts on a child), two of which purportedly occurred between October 4 and 5, 1984, and one of which was alleged to have happened between April 8 and September 28, 1984. Of the remaining three counts, two were for violations of Penal Code section 288a, subdivision (c) (oral copulation with a minor under the age of 14) and one was based on Penal Code section 288, subdivision (b) (lewd act on a child by means of force or fear).

[2] Laurie testified that approximately three weeks before D. first mentioned being molested, she had allowed D. to watch a television program about child sexual abuse and had discussed the subject with her. In addition, various witnesses testified that D. and some of her playmates at the Mountain View Apartments engaged in sex-related play or talk.

D. was admitted to Bay General Hospital on the evening of October 3, 1984, for corrective surgery on her elbow. The surgery was performed the following morning and D.'s arm was placed in a cast. Laurie visited D. on the afternoon of the 4th. As she was leaving at approximately 3:30 p.m., she encountered her husband. They talked for about 30 minutes. Terence wanted to resume their marital relationship. Laurie replied that she would not consider it until D. had been interviewed by a social worker regarding her molestation allegations. Laurie testified she left explicit instructions with hospital personnel that Terence was not to be allowed to visit D.[3] Nonetheless, when she left to catch the bus to the shelter, she assumed Terence was going to see D. and did nothing to try to stop him.

Terence proceeded to D.'s room to visit. The nurses allowed him to spend the night in a chair in his daughter's room. At least until 11 p.m., a video camera was in operation which allowed the nurses to monitor the interior of D.'s room. Later the monitoring system was turned off. Throughout the night, the nurse on duty checked D.'s room at one- to two-hour intervals. D.'s maternal grandmother and aunt came to visit her between 8 and 8:30 p.m. and stayed for about a half-hour. Although they noticed nothing unusual about D., they did recall that Terence acted uncommonly nervous.

D. testified that Terence molested her on the night of October 4-5. Using anatomically detailed dolls at trial, D. demonstrated how Terence used his hands and mouth to touch her vaginal area, navel, nipples and rectal area. She testified that Terence gave her a "marriage-type kiss" on the mouth and forced her to touch his penis. She also manipulated the dolls to show the adult male's penis touching the female child's vagina, rectal area and nipples. During the demonstration, D. undressed the female doll but left the adult male doll fully clothed. Nonetheless, she testified verbally that her father was naked during the molestation and that afterward, he watched television in her room with his clothes off. She also stated that the "bad touching" occurred before her grandmother and aunt visited her.

Laurie arrived at the hospital at approximately 11 a.m. on the morning of October 5 to arrange for D.'s release. She met Terence in D.'s room and went to have a cup of coffee with him. Returning to D.'s room a short time later to get her dressed, Laurie discovered several small, dried yellowish spots on the bottom sheet and a yellowish sticky discharge on the lips of D.'s vagina. She described it as having a "salty" odor.

Laurie immediately called the duty nurse, Bernardina Ochoa, to check the situation. Ochoa discovered a brown, dried substance on D.'s inner

---

[3] Laurie's testimony was disputed by the admitting nurse who admitted D. on October 3. He testified based on written hospital records that Laurie requested Terence not be permitted to remove D. from the hospital but made no mention of any limits on visitation.

thigh and a thick white secretion in the vaginal area. She testified she thought the white substance was semen. After cleaning up the substances, Ochoa at Laurie's request placed the washcloth, towel, sheet and D.'s hospital gown in a plastic bag for safekeeping.

D. was then interviewed by the hospital social worker. In unsupervised play with commercially available toy dolls, D. acted out and narrated several stories. The stories all ended with D. saying, "And father molested her." At the end of one of the stories, D. added, "And he kicked her in the head and broke her and she died."

D. was examined by Dr. Joan Reese, a pediatrician at Children's Hospital, late in the afternoon of October 5. Dr. Reese testified she observed a variety of things which were consistent with both long-term and recent sexual abuse including a relaxation of the sphincter, hyperpigmentation and wrinkling of the labia, a relaxation and thickening of the hymenal opening and erythema (redness) in both the vaginal and rectal areas. On cross-examination, the doctor agreed that the symptoms she observed could have been caused by things other than sexual abuse. She also testified that D. did not exhibit certain symptoms such as anal fissures or hymenal tears which would also be consistent with abuse. Based largely on the absence of the latter factor, Dr. Reese admitted her observations were more consistent with digital rather than penile penetration.

Another pediatrician, William McCord, testified as a defense expert. In addition to agreeing that the observed symptoms were not necessarily attributable to sexual abuse, Dr. McCord also testified that a monillia infection causes a vaginal discharge which is easily confused with semen.

DISCUSSION

I

■ Dr. Margaret Vernon, a licensed psychologist, testified for the prosecution regarding the CSAAS. Her wide-ranging testimony discussed in general how children react to abuse, how they report abuse and why they behave in ways which adults often misinterpret as indicating the child is fabricating all or part of the story.

Defense counsel initially objected to the introduction of Dr. Vernon's testimony as violating the *Kelly-Frye* test.[4] The trial court ruled that the

---

[4] See *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145].

testimony was admissible to a limited extent. The judge stated that the expert could "talk about this syndrome, and what occurs to victims as a class, which is consistent therein, because that will aid the jury because they've heard those things that the child did, that ordinarily they would believe that a child who did this type of thing would be fabricating, but if they find as a victim of a class this is consistent, done within the class and it really shouldn't be used against the child . . . ." He indicated he would be "delighted" to instruct the jury that "the expert was not being asked whether the children were telling the truth" if requested by defense counsel. At one point during Dr. Vernon's testimony, the court admonished the jury sua sponte that "this . . . is a proper subject for expert testimony to aid the jurors in understanding of factors which influence the child's behavior, that's the only reason this testimony is being allowed in for your use in that capacity. [¶] You may proceed, but there should be no references to this particular defendant." No other limiting instructions were given, apparently because defense counsel never requested any.

In *People* v. *Bowker, supra,* 203 Cal.App.3d 385, this court considered the general question of the admissibility of CSAAS testimony within the constraints of the Supreme Court's rape-trauma-syndrome decision in *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291]. We explained that *Bledsoe* and the *Kelly-Frye* test preclude the admission of CSAAS evidence to prove that a child has been abused because the syndrome was developed not to prove abuse but to assist in understanding and treating abused children. In other words, the syndrome assumes as its premise that the child has been sexually molested. *Bowker* goes on to examine the tension between the inadmissibility of CSAAS evidence to prove abuse and *Bledsoe's* allowance that testimony about the behavior of abuse victims, which derives in large part from CSAAS research, is admissible to dispel common misconceptions the jury may hold as to how such children react to abuse. We discussed how expansive "educational" testimony on CSAAS by a psychology professional—even if reference to the specific victim is avoided—has the potential of being used by an untrained jury as a construct within which to pigeonhole the facts of the case and draw the conclusion that the child must have been molested. (203 Cal.App.3d at p. 393.)

We endeavored to resolve this tension by imposing two requirements. First, the expert's testimony must be narrowly tailored to the purpose for which it is admissible. In other words, the prosecution is obligated to "identify the myth or misconception the evidence is designed to rebut" and the testimony must be limited to exposing the misconception by explaining why the child's behavior is not inconsistent with his or her having been abused. (203 Cal.App.3d at p. 394.) Second, if requested the jury must be

admonished "that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true. . . . The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*Id.* at p. 394, italics in original.)

In this case, Dr. Vernon's testimony clearly violated the first of the two *Bowker* requirements.[5] The prosecutor did not identify any misconceptions and, more importantly, Dr. Vernon's testimony was not limited to explaining why D.'s behavior was not inconsistent with her testimony that her father had molested her. Nonetheless, we do not believe it reasonably probable that the overbreadth of Dr. Vernon's testimony contributed to the result.

To begin with, much of the evidence would have been admissible in any event. Although Dr. Vernon gave a general outline of CSAAS which included a brief description of the five component parts or stages of the syndrome, most of her testimony focused on those components which relate to why abused children often delay reporting and why they make inconsistent statements when they finally do report an incident or practice of molestation. Here, D. initially delayed in reporting abuse by her father and then told varying stories about the details of such abuse, going so far as to retract her accusations after the police investigators emphasized to her the seriousness of the charges.[6] Dr. Vernon's testimony was clearly admissible to explain why D. might behave in such a manner and still be a victim of sexual abuse.[7]

In addition, although defense counsel made an initial general objection to any expert testimony related to CSAAS, he never made any specific objections based on the breadth of Dr. Vernon's comments. Moreover, much of

---

[5] We cannot rely on the second of the *Bowker* requirements because defense counsel never requested an admonition after the trial judge indicated a willingness to give one.

[6] Dr. Vernon explained why children do not typically maintain a consistent story after having disclosed abuse. "It all depends on the reactions of her parent and the people interviewing her and the response of people around her. [¶] And it is very likely that she will get some negative feedback. She'll [get] some kind of negative response from somebody, and she is very sensitive to that negative response and the minute she gets some clue that somebody's not believing her, or blaming her, she is going to take that away, she is going to retract."

[7] It is primarily for this reason we reject Bothuel's additional contention that the jury's verdict is not supported by substantial evidence. (See *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Bothuel relies principally on the alleged inconsistencies in D.'s testimony. Yet, as the properly admitted portions of Dr. Vernon's testimony demonstrated, these supposed inconsistencies—which Bothuel argues are indicative of a fabricated accusation—are quite consistent with a child having been abused.

the overly broad testimony given by Dr. Vernon was elicited by defense counsel during cross-examination.[8]

Finally, the trial court clearly demonstrated its understanding of the limited basis for which the testimony was admissible and—despite defense counsel's failure to request an instruction—admonished the jury about its restricted use. (See *ante,* p. 587.) Although Bothuel would likely have been entitled to more comprehensive instructions on request, the admonition given went a considerable distance toward dispelling any prejudice arising from the overbreadth of Dr. Vernon's testimony. Accordingly, we conclude it is not reasonably probable the jury would have reached a result more favorable to Bothuel in the absence of the error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *People* v. *Bowker, supra,* 203 Cal.App.3d at p. 395.)

## II

The events at Bay General Hospital on the night of October 4-5 formed the basis for three separate charges against Bothuel: one count of oral

[8] One particularly troubling piece of testimony came in when Dr. Vernon attempted to respond to a somewhat confusing question: "Q Basically either way, a disclosure or nondisclosure doesn't really indicate anything per se, isn't that true, it could be either way?

"A The reason I'm getting hung up on this is because disclosure is correlated with actual abuse because rarely do children disclose when they have not been abused.

"Q Okay. [¶] We'll get into that a little later."

Defense counsel made no motion to strike the answer as nonresponsive. In fact, he later brought up the subject again:

"Q Now, you indicated earlier that you feel that children don't usually lie about reporting sexual abuse; is that correct?

"A That's been my experience.

"Q And that's something that you believe?

"A That's something I believe. I believe that it sometimes can occur.

"Q And doesn't Dr. Summit sort of expouse [*sic*] the feeling that professionals like yourself, when dealing with a child should start out strongly in believing them; isn't that true?

"A I think it is important to portray a feeling of belief to the child. [¶] You may have some of your own questions in your mind, but I think it is important not to portray those.

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q And as a result of that feeling, would you agree that there are cases where a child has lied that have gone undetected by yourself because you have the attitude that you're assuming they're telling the truth?

"A No, I feel like—when I first began in this field, I was taught that children never lie about this, and that was my attitude. [¶] I feel like I'm more aware now of the possibility and I do entertain that possibility.

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q So there's some percentage, ninety or ninety-five, whatever percentage you choose to fix, you feel the children are telling the truth about sexual abuse?

"A Yes. Yes.

"Q But whatever minute percentage there is on the other side, those children are lying, and you believe that, then?

"A It has not been that common, but yes, I believe that exists."

copulation with a child (Pen. Code, § 288a, subd. (c)) and two counts of lewd acts upon a child (Pen. Code, § 288, subd. (a)). In her closing argument, the prosecutor identified at least five different lewd acts other than oral copulation which could provide the basis for the section 288, subdivision (a) charges.[9] D.'s testimony describing these five acts was indistinct as to sequence, manner of occurrence and relationship between particular acts.

The jury was appropriately instructed it had to unanimously agree on a particular act before it could convict on either of the Penal Code section 288 counts. Because there was no special verdict, however, we cannot know which two of the lewd acts relied upon by the prosecutor the jury unanimously agreed upon in order to convict Bothuel. There remains, therefore, the question whether each of the various acts described by D. can properly support a separate violation of section 288, subdivision (a).

Conceptually it is helpful to distinguish two categories of acts which can serve as the basis for a section 288 charge. First, subdivision (a) specifically provides that acts constituting separate crimes punishable under other sections may also be charged as violations of section 288. Thus, acts of unlawful sexual intercourse (Pen. Code, § 261.5), sodomy (Pen. Code, § 286), oral copulation (Pen. Code, § 288a) and penetration by object (Pen. Code, § 289) accomplished with a minor under the age of 14 will support a conviction under section 288. In addition, various other forms of touching and fondling are also actionable under section 288. This latter category has sometimes been referred to as "undefined lewd acts." (See *People* v. *Hammon* (1987) 191 Cal.App.3d 1084, 1091 [236 Cal.Rptr. 822].)

In *People* v. *Perez* (1979) 23 Cal.3d 545 [153 Cal.Rptr. 40, 591 P.2d 63], a multiple sex offense case involving a single adult victim, the Supreme Court held that Penal Code section 654 did not preclude punishing each sex offense separately despite the fact it could be said the defendant possessed a single intent and objective of obtaining sexual gratification. (23 Cal.3d at

---

[9] The prosecutor argued as follows: "Now, counts 2 and 3 involve the same date, the dates when the child was in the hospital, October 4th and 5th, 1984, and the same identical charge. The leud [*sic*] and lascivious act under Penal Code section 288A [*sic*]. Now, there are two separate identical counts for those dates because we are alleging that two separate acts occurred which could be considered leud [*sic*] acts. For example, the victim said that her dad's penis, or, as she called it, weenie or weener touched her vaginal area or pee pee as she called it, and she demonstrated that with the anatomically correct dolls when she was talking about what happened to her in the hospital.

"Another leud [*sic*] act which she described was a marriage-type kiss on her mouth and she described what she thought a marriage-type kiss was. Another separate act again in the hospital was the defendant making the victim touch his penis with her hand and she described others. She talked about the penis and the penis touching her chest, and she pointed on the doll to the nipple areas of the doll. She also pointed to the rectal area. Those were all leud [*sic*] acts different from the oral copulation which is alleged in separate charges."

pp. 552-553.) Later Court of Appeal decisions have relied on *Perez* to reject a defendant's multiple punishment claim under circumstances in which distinct sexual offenses were charged as violations of section 288. (E.g., *People* v. *Reynolds* (1984) 154 Cal.App.3d 796, 809-810 [201 Cal.Rptr. 826] [digital penetration (Pen. Code, § 289) charged as a violation of § 288, subd. (b)]; *People* v. *Phillips* (1985) 169 Cal.App.3d 632, 635, 642 [215 Cal.Rptr. 394] [same].) Obviously where identical acts are involved, the double punishment issue cannot turn on whether the defendant is charged with violating section 288 or a more specific statute.

A more difficult issue is presented when some or all of the Penal Code section 288 charges against a defendant are based on so-called "undefined lewd acts." This is because acts of touching and fondling are often incidental and preparatory to the commission of other defined acts and must appropriately be viewed as part and parcel of a single offense. (See *People* v. *Hammon, supra,* 191 Cal.App.3d at p. 1097 ("To define a sexual offense along the lines of each individual penetration or contact would lead to absurd results.").) Thus, in *People* v. *Greer* (1947) 30 Cal.2d 589, 604 [184 P.2d 512],[10] the Supreme Court held that the forcible removal of the victim's underclothes before a rape was not a separately punishable lewd act within the meaning of section 288. A year later in *People* v. *Slobodion* (1948) 31 Cal.2d 555 [191 P.2d 1], the Supreme Court distinguished *Greer* in a case in which evidence of an act of rape supported a conviction for violating section 288 apart from a separate conviction for oral copulation based on section 288a. (31 Cal.2d at pp. 562-563.) Explaining its conclusion, the court noted that although the acts "were all committed within a relatively short period of time," the defendant "committed acts separately denounced in two code sections, *independent of section 288,* and these offenses are not necessarily or even normally associated with each other. [¶] The acts forming the basis for the charge under section 288 were not mere fondling and touching preparatory to the commission of the acts denounced by section 288a." (*Id.* at p. 563, italics added.)

The principles of *Greer* and *Slobodion* were applied in *People* v. *Cline* (1969) 2 Cal.App.3d 989 [83 Cal.Rptr. 246] and *People* v. *Ross* (1965) 234 Cal.App.2d 758 [44 Cal.Rptr. 722] to reverse Penal Code section 288 convictions which were based on "undefined lewd acts" incidental to another defined crime. In *Cline,* the defendant touched various portions of the victim's body before he performed an act of oral copulation. In *Ross,* over a period of 20 to 30 minutes, the defendant touched the breasts and genitals of the 13-year-old victim before he engaged in forcible intercourse. In each

---

[10] *Greer* was overruled on other grounds in *People* v. *Pearson* (1986) 42 Cal.3d 351, 357-358 [228 Cal.Rptr. 509, 721 P.2d 595].

case, the court concluded that although there was more than one touching, a single crime had been committed. (See also *People* v. *Perkins* (1982) 129 Cal.App.3d 15, 19 [180 Cal.Rptr. 763]; *People* v. *Webb* (1958) 158 Cal.App.2d 537, 542-543 [323 P.2d 141].)

*Greer* and *Slobodion* stand for the proposition that where there is but a single defined sexual act, incidental touchings may simply constitute part of a single indivisible course of conduct which is punishable as a single violation of section 288.[11] Here, D.'s testimony suggested she may have been raped, sodomized and digitally penetrated during her stay in the hospital. She also identified other touchings which, given the lack of specificity in her testimony, must be assumed to have been incidental ones.[12] If the two Penal Code section 288 convictions were based on unanimous jury agreement as to the rape, sodomy and/or digital penetration, they would clearly be proper under *People* v. *Perez, supra,* 23 Cal.3d 545 and its progeny. ■ But not only did the information fail to specify which acts the two counts pertained to; the prosecutor invited the jury to consider any number of other incidental touchings which were insufficient to support a separate section 288 conviction.

Because of this error, we cannot know for certain whether the jury relied on a permissible or impermissible basis for finding Bothuel guilty on two counts of violating Penal Code section 288 in addition to one count of oral copulation (§ 288a). Nonetheless, we are unable to conclude there is any reasonable possibility the jury would have reached a different result in the absence of the error. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)[13] The key issue in the case was the credibility of D. There was no reasonable basis for the jury

___

[11] This is not to say that "undefined lewd acts" which are committed in some proximity to a defined act can never be subject to separate punishment. (See, e.g., *People* v. *Blevins* (1984) 158 Cal.App.3d 64 [204 Cal.Rptr. 124]; *People* v. *Akers* (1956) 143 Cal.App.2d 224 [299 P.2d 398].) Just as in the case with two or more defined acts of the same character, an undefined act is not incidental to a defined act where it is separated from a defined act by an appreciable period of time during which the defendant ceased the assaultive conduct and had a reasonable opportunity to reflect on his behavior before committing another lewd act. (See *People* v. *Hammon, supra,* 191 Cal.App.3d at pp. 1098-1099.) The descriptions of the facts in *Blevins* and *Akers* are not sufficiently detailed to discern whether they are consistent or inconsistent with this analysis.

[12] In other words, the record is simply insufficient to support a finding that the undefined acts were not incidental. Even if the evidence were in conflict on the point, however, the court should have instructed the jury it could not find the defendant guilty of a section 288 violation based on testimony regarding "undefined lewd acts" unless it determined such acts were not incidental to other charged crimes. There was never any such instruction here.

[13] We assume without deciding that the central trial court error in this case was its failure to instruct the jury that incidental touchings could not form the basis for a separate section 288 conviction (see *ante,* fn. 12) and that therefore, the *Chapman* test is applicable. (See generally *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101].)

to conclude she was telling the truth as to certain incidental touchings but lying as to the rape, sodomy and digital penetration.[14] In fact, the only evidence which cast doubt on the specifics of D.'s testimony was Dr. Reese's admission that the physical evidence was more consistent with digital penetration of the vaginal and anal openings rather than penile penetration. (See *ante*, p. 586.) In either case, however, two acts separately punishable under section 288 were committed.

## III

Officer John Duncan of the Chula Vista Police Department transported D. from Bay General Hospital to Children's Hospital on the afternoon of August 5. While he was at Children's Hospital, he learned the washcloth and towel which had been used by Nurse Ochoa to clean D. had been retained at Bay General. He later contacted the police dispatcher between 8 and 9 p.m. and was informed the items had been saved for some period of time but had since been placed in the laundry bin. Thereafter he made no further attempt to retrieve the items even though they apparently remained separated from the rest of the laundry in a plastic bag until approximately 10 p.m.

Defense counsel made a pretrial motion based on *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361] and *People* v. *Nation* (1980) 26 Cal.3d 169 [161 Cal.Rptr. 299, 604 P.2d 1051] to dismiss the case or for "favorable findings of fact." The hearing on the motion included testimony by Officer Duncan and Nurse Ochoa. The evidence failed to establish the police were at any time made aware that the towel and washcloth were retrievable after they were placed in the laundry bin. The trial court denied the motion.

■ *Hitch* and *Nation*, to the extent they are not supplanted by *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528],[15] establish a duty on the part of police investigative agencies to take appropriate steps to preserve evidence which it is reasonably possible may be material to the defense. As the Supreme Court recognized in *People* v. *Hogan*

---

[14] In *People* v. *Van Hoek* (1988) 200 Cal.App.3d 811, 817 [246 Cal.Rptr. 352], the victim testimony "consisted of a blur of acts, nonspecific as to a particular occasion." Because the defendant's ability to challenge the victim's testimony was impaired by the lack of specificity, the court found "unavailing" the argument that the jury in all likelihood found the victim credible and believed all the acts had occurred. Here, D.'s testimony focussed on a particular date and place and the concerns expressed by the *Van Hoek* court do not apply.

[15] In *Trombetta*, a case involving breath samples obtained by police in a drunk driving case, the United States Supreme Court determined that the preservation of evidence was not always mandated by federal due process considerations. The California Supreme Court has yet to address a preservation-of-evidence issue following *Trombetta*.

(1982) 31 Cal.3d 815, 851 [183 Cal.Rptr. 817, 647 P.2d 93], however, there is generally no corresponding duty to *obtain* evidence which may aid a criminal defendant, at least where the evidence is not known by the police to be exculpatory.[16] (See *People* v. *Bradley* (1984) 159 Cal.App.3d 399, 408 [205 Cal.Rptr. 485].)

Here, no one from the police department ever obtained the washcloth and towel from the hospital. Bothuel suggests the police were in constructive possession of items when hospital personnel informed them of their existence. At best, however, the evidence presented in support of the *Hitch* motion established that certain hospital employees recognized the towel and washcloth were significant. Unfortunately, this information was communicated to the police in such a way that Officer Duncan reasonably believed the items had already been disposed of. Accordingly, even if a constructive possession theory were available in a *Hitch/Nation* situation, there is an insufficient factual basis for applying it here.

Under these circumstances, the trial court properly denied Bothuel's *Hitch* motion.

## IV

Part of Bothuel's defense was his attempt to establish that D. had engaged in a pattern of making false molestation allegations. Consistent with this theory, D. herself admitted she had falsely told her mother at one point that two neighbors had molested her. Bothuel also sought to introduce evidence that approximately eight months after the hospital incident, D. reported to a therapist that her maternal uncle had molested her. Defense counsel made an offer of proof that the uncle would testify he did not molest D.

The prosecution objected to the admission of the uncle's testimony and the trial court excluded it under Evidence Code section 352. The judge stated: "I think under 352 I'm opening the door to a second trial within the first trial. There is no showing that in fact the uncle didn't, so it is just his word against hers, and I'm not going to allow it."

The trial court's ruling was within its discretion. Evidence of D.'s allegation against her uncle was relevant only if the defense could show it was a false allegation. The uncle's self-serving testimony that he did not molest D.

---

[16] There is considerably less need for imposing sanctions on the police for negligence in failing to obtain or preserve evidence which is as likely to be inculpatory as exculpatory. There is no reason to believe that sanctions will deter such negligence any more than will the desire to obtain evidence which will aid in convicting the guilty party.

was hardly compelling evidence of that fact. Moreover, it was subject to rebuttal by evidence showing that he did molest the child.[17] The trial judge could legitimately conclude that a battle over the subsidiary issue of whether the uncle had molested D. would distract the jury and that any probative value would not outweigh the consumption of time and potential confusion which would result from the admission of the evidence.

## V

During *in limine* motions, defense counsel sought a ruling from the trial court as to whether Bothuel could be impeached by his 1977 conviction for burglary. Counsel explained that Bothuel would testify in any event. The court ruled that burglary was a crime involving moral turpitude—and hence admissible under *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111]—but declined to consider exercising its discretion under Evidence Code, section 352 until after the defendant had testified. In response to defense counsel's concern with the remoteness of the nine-year-old felony, the court expressed its view that time was but one factor to be considered in deciding admissibility.

Bothuel now contends the court erred in failing to consider the nature of the crime underlying the burglary conviction in assessing whether it was a crime involving moral turpitude. He also argues the court was obligated to prerule on the admissibility of the burglary conviction for impeachment purposes. Significantly, he does not assert the trial court abused its discretion in admitting the prior felony conviction.

As to the first contention, Bothuel cannot be heard to complain since defense counsel agreed burglary was a crime involving moral turpitude. ■ In any event, under *People* v. *Castro, supra,* 38 Cal.3d at page 314, a crime involving moral turpitude is broadly defined as one indicating "a readiness to do evil." Regardless of its object, a burglary satisfies this threshold. (*People* v. *Williams* (1985) 169 Cal.App.3d 951, 957 [215 Cal.Rptr. 612]; *People* v. *Almarez* (1985) 168 Cal.App.3d 262, 268 [214 Cal.Rptr. 105].)

■ As to the timing of the court's ruling, Bothuel might have a basis for concern if his decision to testify was dependent on the court's ruling. Here, however, Bothuel announced his intention to testify in any event. Thus, even if a defendant is entitled to a ruling on the admissibility of a prior conviction before he decides to testify, there can be no prejudice on the facts of this case.

---

[17] The prosecutor informed the court there was medical evidence which was consistent with a conclusion that D. had been molested at least once after the incident in the hospital.

## DISPOSITION

The judgment is affirmed.

Work, J., concurred.

**WOODWORTH, J.,** Concurring and Dissenting.*—I fully concur in the majority opinion so far as it affirms the judgment of conviction as to counts 1, 2, 4, 5, and 6.

As to counts 2 and 3, however, I believe the appellant is correct in contending there is no factual distinction between those counts. Although the information labels them "first incident" and "second incident" the evidence actually showed only one indivisible course of conduct in the hospital room.

Furthermore, due process of law requires the state to identify the acts upon which the prosecution is based. (*People* v. *Van Hoek* (1988) 200 Cal.App.3d 811, 818 [246 Cal.Rptr. 352].)

On count 2 there was a consecutive sentence and on count 3, concurrent. The conviction of count 3 is duplicative of count 2, and should be reversed.

---

*Assigned by the Chairperson of the Judicial Council.