Filed 5/30/14  P. v. Medina CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GUSTAVO R. MEDINA,<br><br>    Defendant and Appellant. | A137760<br><br>(San Mateo County<br>Super. Ct. No. SC074065) |

Gustavo R. Medina (appellant) appeals from a judgment entered after a jury found him guilty of 12 counts of lewd acts on a child under the age of 14 (Pen. Code, § 288, subd. (a)[1]) and found true the special allegations of substantial sexual conduct (§ 1203.066, subd. (a)(8)) and continuous sexual abuse (§§ 288.5, subd. (a), 1203.066, subd. (b)).  He contends the trial court erred by allowing a social worker who had previously interviewed the victims to testify as an expert on the topic of Child Sexual Abuse Accommodation Syndrome.  We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On March 7, 2012, an information was filed charging appellant with 12 counts of lewd acts on a child under the age of 14 (§ 288, subd. (a)).  The information alleged as to counts 2, 4 and 10 that there was substantial sexual conduct (§ 1203.066, subd. (a)(8)), and alleged as to count 5 that there was continuous sexual abuse (§§ 288.5, subd. (a), 1203.066, subd. (b)).

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

1

At a jury trial, Julia R. testified that she lived in South San Francisco with her 16-year-old daughter, M., her 13-year-old son, G., and her 11-year-old daughter, S. She was married to appellant from 1998 to 2003, and appellant was the biological father of G. and S.

On Sunday, June 12, 2011, Julia R. took the children to San Francisco to celebrate S.'s birthday. Appellant, who worked as a limousine driver, picked up G. and S. later that afternoon and took them to his home.

On June 15, 2011, Julia R. was home with her boyfriend and S. M. was out with a friend and G. was at his cousin's house. Julia R. told S. that she was going to ask appellant to take care of G. and S. the next day while she worked because M., who usually babysat G. and S. while Julia R. worked, was scheduled to go camping and would be unavailable. That night, S. showed a note to her mother that she had written on her iPad, which stated, "I don't know what you call it, but my dad rapes me every time I spend the night with him. I have always wanted to tell you, but I don't know how. I am sorry." Julia R. was shocked, sad, and angry, and asked S. if she knew what the word rape meant. S. responded, "yes." Julia R. called G. and had her boyfriend call M. so that they could take all of the children to the hospital. After picking G. up, Julia R. asked G. if his father had ever touched him, or if he had ever seen him touch S. G. responded, "no." M. asked Julia R. several times what was going on, but Julia R. said she could not talk about it.

Once at the hospital, Julia R. asked her boyfriend to stay in the car with M. and G. while she brought S. inside to wait for the triage nurse. As they waited, a woman came up to Julia R. and asked her if she was okay; Julia R. responded that she was not. At that point, M. came inside the hospital, crying and upset, and said, "mom, he promised if I never told you he wouldn't do that to [S.]." Julia R. grabbed M. and went outside, and as M. repeated what she had just said, the two cried together. G., who realized what was going on, also began to cry, and they all "just stood there together." When Mother went back inside, a police officer came over to speak to her and S. M. and S. were interviewed at Keller Center, located inside a hospital, and the interviews were recorded.

2

M. testified that she first learned appellant had molested S. when she was at the hospital on June 15, 2011. She initially did not know why they were going to the hospital but figured out what was going on—i.e., that appellant was doing to S. what he had been doing to M. for years—when G. told her that their mother had asked whether he had seen appellant touch S. inappropriately. M. told her mother what appellant had done to her, and felt sad and angry for S. because appellant had told her that if she did not say anything about what he did to her, he would not do it to S.

M. testified that it was not easy for her to talk about what happened, but that it was also a relief that she could. M. testified that the sexual assaults started when the family moved to Oregon, when she was five-years-old. Appellant would perform what he called a "massage" by rubbing M.'s inner thighs and private area when she was in the bathtub or on the bed. She recalled this occurring when appellant was "baby-sitting" her, and once when she was sick with pneumonia. Appellant would touch M.'s vagina and her "butt." He touched her with his fingers outside of her vagina. He would put his lips on her neck and say it was what her mother liked. These incidents occurred more than ten times; it was "too many times to recall or count." Appellant also performed oral sex on her "[m]ore than five, seven times," saying that was what her mother liked. Appellant would sometimes call it "playing doctor."

The incidents continued when the family moved back to the Bay Area. M. recalled that when she was watching television, appellant came in and placed a blanket on her legs, massaged her, and moved his hand toward her private area and put her hand on his private area. She pulled her hand back and he continued to massage her and then placed her hand on his penis without his clothing covering it. M. was scared as he moved his hands towards the inside of her vagina.

As M. got older she usually did not go with G. and S. to appellant's house, but she did when S. asked her to. One night, M. recalled waking up to appellant kissing and touching her neck. Her ears were wet and her pants were to her knees, and appellant was moving his penis near her buttocks. He inserted his penis into her vagina. She felt

3

wetness on her lower backside. M. was unable to move or speak. She went to the bathroom and got into the shower and stayed there until the water got cold.

M. also recalled that when she was about 12-years-old, she was in the basement of a house in which appellant lived, when appellant lay on top of her and tried to insert his penis into her from the back. When she closed her "butt cheeks" tight, appellant tried to open the area with his hands while trying to insert his penis, but put on his pants when he heard someone approaching.

M. recalled another incident that occurred near a Union 76 gas station when she and her siblings were in a limousine appellant was driving. Appellant had just purchased an iPad. M. was in the front seat with appellant and G. and S. were in the back, when appellant closed the sliding back window and "started just kissing" M. on her neck as he groped her thighs, up and down with his hand. When M. tried to move away from appellant, he asked, "you don't want the iPad?" At that point, G. and S. started getting "rowdy and loud" so appellant let go of M. and she ran to the back of the limousine.

M. testified that she participated in a pretext call to appellant after Detective Sean Curmi asked her to do so. Curmi "just asked [her] to call [appellant], and to basically ask him why he had been doing that." By the time she made the call, M. was feeling "[n]othing but anger" and told herself there was "no chance of him ever doing that again." She felt "good" testifying at trial because he did not "have any power anymore," and because she felt she no longer had to be embarrassed about what he had done to her.

Curmi testified that a pretext phone call is an investigative tool in which a witness or a victim will call the alleged suspect about the matter in order to spark a conversation about the crime that is being investigated. The pretext phone call of June 17, 2011, was played for the jury. During the call, M. reminded appellant of his promise not to do anything to S. if M. did not tell anyone about what he had done to M. Appellant responded that they needed to talk later. When questioned again, appellant said he would "text" her "later." Appellant then asked to speak to S. saying he wanted to know what S. had told M. He said he was an "affectionate" person, that he "can't help it," and that M.'s mother may have ended the marriage because she could not "handle it." Appellant

4

said he was also unable to "handle it" and said, "I was being affectionate, you know?" Appellant asked to speak to M.'s mother and asked if M. had told her mother anything, to which M. responded "no."

M. then told appellant that she was calling him because S. might be pregnant. Appellant responded that S. was not of "age," then asked if M. thought he was "very bad." M. responded that she wanted him to stop what he was doing to S. Appellant said, "Okay, I'm gonna stop it," "Okay, I promise, swear, swear to God, you know? I promise you." He said he was going to be more respectful towards S. and treat her like a daughter.

M. asked several times what appellant had done to S., and appellant ultimately said he did not want to answer the question. He told M. that she "still need[s] to learn" "how human beings are" and how men behave. M. told appellant that as a parent, he should have been protecting S., not hurting her, and that while physical pain may go away, mental pain "can never heal." Appellant told M. she had to learn that "in society you can be hurt mentally many times in many ways." M. asked, "Did you or did you not have sex with me?" Appellant responded that he did not "have a good memory." He then asked, "do you want money from me? I—I'm not rich, okay?" He asked whether M. wanted him out of her and her sibling's lives.

M. asked, "Do you want me to tell my mom, Gus?" Appellant responded, "I don't want you to, uh, to tell your mom." He said M.'s mother would "hate" him and that her telling her mother would result in his children being taken "away from [his] life." M. asked if he thought it was "wrong to touch and have sex with kids," to which appellant responded by asking, "what do you want from me?" M. asked if he at least "use[d] a condom"; appellant said he did not know what M. was talking about, and that he could not talk about it on the phone. When M. asked appellant if he thought it was ok to "do it to [S.]," appellant responded S. was "by blood" and that he had the "right" to "give her affection." M. asked if putting his penis on her and M. was "affection." Appellant told M. that the children needed him for support, and that he needed to go to the post office to

5

make a child support payment.  As M. asked more questions, appellant hung up.  The phone call lasted approximately 30 minutes.

S. testified that in June 2011, she spent her birthday with her mother and siblings.  She and G. then went to spend the night at appellant's house.  S. put on her pajamas and fell asleep on the bed.  She woke up to appellant "scooting" towards her in bed; her pajamas had been taken off.  Appellant's hands were touching her chest area and his "private part" was between her legs.  She believed he was "try[ing]" to go inside of her.  Appellant's penis was touching her "butt area" and it was wet and soft.  Appellant eventually turned over, put his pants on, put S.'s pants back on, and went to sleep.  S. felt wetness on her backside.

The next night, S. went to sleep alone on a pull-out futon; G. and appellant slept together on the bed.  When S. woke up in the middle of the night, appellant was next to her and she felt something between her legs from the front.  Appellant was moving his hands around her backside and chest.  She felt something soft and wet on her front private part.  Appellant moved her over so that she was on her stomach.  He then tried to put his penis in between the cheek area of her "butt" and there was pressure.  She then felt wetness, and appellant turned around and went to sleep.

Shortly thereafter, S. wrote a note to her mother.  S. had learned that M. would not be available to babysit her the next day, which made her sad because it meant she would have to go to appellant's house and spend the night.  She also knew that appellant had been planning a camping trip with them for a few days after that and she would have to spend more time with him.  At that point she went into her room and wrote a note on her iPad, stating she did not know how to say it, but that every time she spent the night with appellant, he raped her.  She said that appellant did similar things to her when she was younger, on more than 20 occasions.  The incidents would occur at various times, such as when they went camping.  She was afraid to tell anyone and did not think people would believe her.

Dr. Jose Pena, a pediatrician with the County of San Mateo, testified that he, with the assistance of a nurse, conducted a medical examination on S. on June 16, 2011.  Pena

6

testified that he did not see anything out of the ordinary, and that often, sexual abuse leaves no signs of injury, trauma, or bleeding.

Miriam Wolf, a licensed clinical social worker, testified that she worked at Keller Center as a forensic interview specialist. She had conducted over 1,000 interviews and had written curriculum and provided training for California law enforcement and other professions for the past 15 to 20 years. Based on her training and experience, the court qualified Wolf to testify in the area of Child Sexual Abuse Accommodation Syndrome (CSAAS). Before Wolf testified, the trial court admonished the jury as follows: "This testimony about sexual abuse accommodation syndrome is not evidence that the defendant committed any of these alleged crimes charged against him. You may decide this evidence, whether or not S[.] or M[.]'s conduct was inconsistent with the conduct of someone who had been molested, in evaluating the believability of their testimony."

Wolf testified that she interviewed 60-70 percent of the minors who arrived at Keller Center. Although she was told that she interviewed the victims in this case, she did not recall interviewing either of them and had not reviewed their interview DVDs. Wolf understood that she would testify as an expert on CSAAS in general and would not testify to specifics about the minors in this case. Wolf testified that CSAAS first appeared in literature in 1983. The author, psychiatrist Roland Summit, wrote down behavior patterns he observed in patients he treated. He wrote of five different categories of responses he saw in victims of child sexual abuse. At the time, there were myths that people held about child sexual abuse, as to how it happened and how children told others what had happened to them. One misconception was that children would tell someone right away that they had been sexually abused. Instead, the statistics showed that only a small percentage of children reported sexual abuse right away, and that as many as two-thirds of them disclosed it for the first time as adults. Summit wrote his article in order to dispel the myths that were based on what adults expected from children.

The five stages of responses to sexual abuse that Summit observed were: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed or unconvincing and hesitant disclosure; and (5) retraction. Secrecy was very common

7

because the abuse usually occurred in secret, and because overt or subtle threats or promises would be made to prevent the child from talking about it. Helplessness would occur because the child was frequently dependent on the adult or older person. Entrapment and accommodation would occur when a child would realize that he or she needs to find a way to live with the secret. Delayed or unconvincing disclosure would occur because a child might disclose only a little part of what occurred. The final stage, retraction, would occur when a child would see the result of disclosure, e.g., an arrest, and decide to take back what he or she had said.

After Wolf testified, her interviews of M. and S. were played for the jury. At the end of the case, the court instructed the jury as follows: "You have heard the testimony from Miriam Wolf regarding child sexual abuse accommodation syndrome. Miriam Wolf's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [S.] or [M.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

Appellant took the stand in his own defense and denied he had performed any of the acts M. and S. said he had done. He admitted he was convicted of perjury in 2008. He testified that when M. made the pretext call, he thought it was her mother calling as a joke. When asked why he called M. by her name if he thought it was M.'s mother who was calling, appellant said he did so because he was joking back at her. He also thought at one point that both M. and her mother were on the phone, playing a joke on him together. Appellant further testified that when he asked M. during the call, "do you want money from me[?]", he was referring to the fact that M. had asked him for some money a few days before the call, to buy a pair of sunglasses. He testified that when he said he was "going to stop it," he was referring to the fact that he was going to stop yelling at S. the way he had yelled at M. in the past. When he swore to God and promised he would stop doing to S. what he did to M., he thought M. was referring to the fact that she did not want appellant to cut S.'s hair the way he had cut M.'s hair.

Appellant testified that he had difficulty concentrating during the call because he does not understand English very well. He said he also did not give the call much "importance" because he was busy doing other things at the time. He further testified that he believed M. might have influenced S. to make up the allegations so that they could spend more time with their mother, as he was strict about the children completing their homework and they did not like that.

The jury found appellant guilty of all counts and found true the special allegations. The trial court sentenced appellant to prison for a total term of 180 years to life.

## DISCUSSION

### *Expert Testimony*

Expert opinion testimony is admissible when it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) We review the admission of expert testimony for an abuse of discretion. (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 902.) The abuse of discretion standard requires a " ' "*clear showing of prejudice*" ' " that the ruling " ' " ' " 'falls outside the bounds of reason.' " ' " ' " (*People v. Soper* (2009) 45 Cal.4th 759, 774.)

California law permits the admission of expert testimony concerning CSAAS for the limited purpose of disabusing a jury of common misconceptions it might hold about how a child reacts to a molestation. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1302; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744.) Such testimony may be introduced on rebuttal or as part of the prosecution's case-in-chief, as long as the victim's credibility has been placed in issue due to paradoxical behavior, including a delay in reporting the molestation. (*Id*. at p. 1745.) The expert's testimony "must be narrowly tailored to the purpose for which it is admissible," i.e., to " 'identify the myth or misconception the evidence is designed to rebut.' " (*People v. Bothuel* (1988) 205 Cal.App.3d 581, 587, overruled on other grounds in *People v. Scott* (1994) 9 Cal.4th 331, 348, fn. 10.) The court must instruct that the expert's testimony is not intended and should not be used to determine guilt. (*Id*. at p. 348.)

9

Appellant contends the trial court erred in allowing Wolf to testify as an expert on the topic of CSAAS because she had previously interviewed M. and S. at Keller Center. He asserts "there was a great risk that the jury would consider [Wolf's] demeanor, accepting the victim's statements during the interviews, along with her expert testimony . . . as an opinion on the truth of the victim's statements and the charges." Wolf, however, testified only generally about the concept of CSAAS and said she understood that her role was limited to providing expert testimony. She testified about the five categories of CSAAS and did not tie the categories to the specific facts of this case. She had no recollection of interviewing M. or S., had not reviewed their interview DVDs, and offered no opinion as to her belief regarding their claims. Further, the court disabused the jury of any misunderstanding it may have had about Wolf's role as an expert in the case by admonishing the jury before the CSAAS testimony and by providing a required instruction on how to view the testimony. There was no abuse of discretion.

Appellant also asserts the admission of Wolf's testimony violated his right to due process because Wolf's testimony "boosted [the victims'] credibility," thereby denying him the "right to have witness credibility decided by the trier of fact." He forfeited this claim by failing to raise it below. (*See People v. Davis* (1995) 10 Cal.4th 463, 505.) In any event, the claim is without merit. A trial court violates a defendant's due process rights where it commits an error that renders a defendant's trial arbitrary and fundamentally unfair. (*Estelle v. McGuire* (1991) 502 U.S. 62, 67–75.) A trial court's admission of evidence constitutes such a due process violation if there are no permissible inferences the jury may draw from the admitted evidence. (*Jammal v. Van De Kamp* (1991) 926 F.2d 918, 920.) Here, as noted, Wolf's testimony was relevant to the issue of victim credibility and was properly admitted for "the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to molestation." (*People v. Patino*, *supra*, 26 Cal.App.4th at p. 1744.) Admission of the evidence did not render the trial fundamentally unfair.

Moreover, even assuming the trial court erred by allowing Wolf to give expert testimony, we conclude the error would have been harmless under any standard of

10

review.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)  The evidence of appellant's guilt was nothing less than overwhelming.  M. and S. described in detail how appellant molested them.  They corroborated each other with their similar accounts of appellant's pattern of abuse, including isolating them, touching them while they slept, pulling down their pants, placing his penis between their legs and trying to have intercourse with them.  The jury believed M. and S. over appellant, most likely not because of anything Wolf testified to, but because appellant acknowledged his inappropriate sexual conduct during the pretext call during which he said he was an "affectionate" person, said he could not "help it" or "handle it," and promised M. he was going to "stop," and start being respectful to S. and treat her like a daughter.  When M. asked appellant if he had sex with her, appellant did not deny it, but rather, said he did not "have a good memory."  All of his explanations on cross-examination as to why he made those comments during the pretext call were also not credible by any means.  In light of the overwhelming evidence against appellant, any error was harmless.

### DISPOSITION

The judgment is affirmed.

_____
McGuiness, P.J.

We concur:

_____
Siggins, J.

_____
Jenkins, J.

11