Filed 12/19/22  P. v. Barber CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D079865 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FWV20004012) |
| GREGORY WAYNE BARBER, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Bernardino County, Shahla S. Sabet, Judge.  Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel B. Rogers and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

Defendant Gregory Wayne Barber appeals from a judgment of conviction entered after a jury convicted him of various crimes related to the sexual abuse of his granddaughters.

On appeal, Barber raises multiple contentions regarding to the admission of expert testimony from an investigating detective concerning how children typically disclose sexual abuse. Barber first argues that the trial court erred in permitting a detective to testify about how child sexual abuse victims commonly behave after having been sexually abused. Barber contends that this testimony was akin to expert testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS), and that a trial court should be required to hold a hearing to determine the scientific acceptance and reliability of such evidence under *People v Kelly* (1976) 17 Cal.3d 24 (*Kelly*) prior to admitting the testimony. Barber maintains that if the trial court had held such a hearing, the court would have necessarily concluded that CSAAS is not a scientific theory that is generally accepted in the relevant scientific community and would have excluded the testimony. Barber also contends with respect to this argument that because this evidence was "irrelevant and inflammatory" and not subject to *Kelly*'s reliability requirement, its admission rendered his trial fundamentally unfair.

Second, Barber argues that, apart from the requirements of *Kelly*, CSAAS evidence generally should be determined to be inadmissible for all purposes because, according to Barber, such evidence fails to meet the requirement of reliability for expert testimony, as set forth in Evidence Code section 801.

Third, Barber contends that the trial court should have excluded the detective's testimony concerning common behaviors of child sexual abuse victims because there is no longer a need to dispel misconceptions harbored by laypersons about the behavior of victims of sexual abuse—the purpose for which such evidence has been deemed admissible. Barber maintains that the public "no longer harbors misconceptions about the behavior of sexually abused children." (Boldface and capitalization omitted.)

Fourth, Barber claims that the trial court erred in permitting the detective to testify regarding common behaviors of child victims of sexual abuse because the detective's expert testimony "closely tracked the facts of this case." Barber argues that this "allowed the jury to apply the syndrome to the facts of the case and conclude that both [granddaughters] were sexually abused," which is an impermissible use of such testimony.

Barber's last contention related to the detective's expert testimony regarding sexual abuse disclosures is that the trial court committed instructional error in failing to provide a limiting instruction informing the jury that it could consider the detective's testimony for the sole purpose of deciding whether the victims' conduct was not inconsistent with the conduct of a person who had been sexually abused, and not for the purpose of determining whether the sexual abuse had occurred.[1]

In a final argument, Barber contends that the trial court abused its discretion in allowing the parties to make additional closing arguments after

---

[1]     The People contend that Barber failed to request this limiting instruction and that he has therefore forfeited the contention on appeal. In response, Barber asserts that the trial court had a sua sponte duty to provide the limiting instruction, or, alternatively, that his trial counsel rendered ineffective assistance in failing to request the instruction. We address these contentions in our discussion of this argument.

the jury indicated during deliberations that it had a question concerning why multiple counts were alleged in connection with what the jury perceived to be a single act. The People contend that Barber forfeited this argument by failing to make a specific and timely objection. Barber argues that, to the extent his trial counsel failed to properly object, such failure constituted ineffective assistance.

Because we conclude that none of Barber's contentions warrants reversal, we affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL HISTORY

### A. *Factual background*

#### 1. *The prosecution's case*

Barber and his wife had three children, two boys and one girl, Mary Doe. One of Barber's sons had three children of his own—one son and two daughters. One of Barber's granddaughters, Jane Doe 1 was born in 2006, and the other, Jane Doe 2, was born in 2007. When Jane Doe 1 was born, her family was living with Barber and his wife in Chino, California. Although Barber's son's family subsequently moved out, the son and his children returned to Barber's home in 2011 or 2012, after the son and his wife divorced. Barber sometimes babysat Jane Does 1 and 2 at the house in Chino.

##### a. *Mary Doe discloses that Barber abused her when she was a child and he serves time in prison for that abuse*

In December 2016, when Mary Doe was an adult, she disclosed to a friend, and then to her younger brother, that her father, Barber, had molested her when she was a child. Mary Doe later disclosed the abuse to her mother, who appeared shocked by what Mary Doe divulged. The day

4

after she disclosed the abuse to her mother, Mary Doe reported the sexual abuse to police.

According to Mary Doe, Barber began molesting her when she was in kindergarten. The abuse occurred principally in her parents' bedroom, but it also occurred in the garage, shower and a family car. Mary Doe stated that the abuse occurred even when other members of the family were at home, and sometimes when she was in bed with her mother and father while her mother was sleeping.

When Barber abused Mary Doe in the garage, Barber would lock the door. There were instances when Mary Doe's mother tried to get into the garage while the abuse was taking place, but the door was locked. Barber would stop molesting Mary Doe and unlock the door; Mary Doe's mother would be upset that the door had been locked.

According to Mary Doe, she became accustomed to the manner in which Barber would molest her. It happened in the same way, generally, each time, and it usually occurred multiple times a week. Barber would start by taking off Mary Doe's shirt and begin touching her breasts. He would take off her pants or shorts and his own clothes, so that both of them would be completely undressed. Barber would touch Mary Doe's vagina with his fingers. He would have her touch his erect penis. Mary Doe remembered that Barber would "ask [her to] get a towel or get a sock or something out of the hamper so he could clean himself with [it]." Other times, Barber would "guide [her] down" and "that was [her] cue" that he wanted her to orally copulate him. Barber also orally copulated Mary Doe.

The molestation stopped when Mary Doe was 13 years old. Mary Doe had begun to understand "the dynamic [of] relationships between a boy and a girl," and at that point she "realized that what was happening -- what [her]

5

relationship was with [her] father wasn't normal." Mary Doe told her father that she "didn't want to anymore, and that if he didn't stop, that [she] would tell [her] mother." In response, Barber told Mary Doe that "it was a secret" and "nobody could know." Barber stopped the abuse, and Mary Doe did not tell anyone about the abuse for many years.

Mary Doe was aware that her aunt had disclosed that Mary Doe's grandfather had abused the aunt, and the aunt's family "mistreated" her after her disclosure. When Mary Doe eventually disclosed Barber's abuse, her brother was "angry" with her, and her mother "questioned [her] a lot and, kind of, defended [Barber] a little bit."

After Mary Doe revealed the sexual abuse to police, a detective asked her to participate in a recorded telephone call during which she would try to get Barber to confess to the abuse. Mary Doe called Barber from her cell phone and confronted Barber about the abuse. Barber admitted to the sexual abuse, and began crying and "blam[ing]" his wife for failing to "giv[e] him affection." Barber told Mary Doe that he had hoped that she "would forget about it." Barber admitted to her that "it was exciting for him, [and] that he thought it would be exciting for [her], as well."

After this telephone call took place, Barber was arrested. Not long after Barber's arrest he was released on bail, and he eventually reached a plea deal. He began serving a prison term in connection with his abuse of Mary Doe in September 2017.

b. *Barber's son begins to suspect that Barber sexually abused his granddaughters, Jane Does 1 and 2*

Barber's son testified about a few incidents that caused him to be concerned that Barber may have molested his granddaughters. According to Barber's son, one incident that aroused his suspicion occurred when Jane

Doe 1 and Barber were alone in the garage. The only door to the garage was locked; Barber's son knocked on the door for about 5-10 minutes before Barber unlocked the door. Barber said at the time that he had been under the car working on it and that Jane Doe 1 had been playing a game. Although Barber's son was not entirely comfortable with that explanation, he decided to "let that go."

The second incident occurred when Barber was babysitting Jane Does 1 and 2. Barber's son walked into the bedroom where all three of them were and saw one of his daughters wearing "little booty shorts" and "doing cartwheels in front of [Barber], fairly close." According to Barber's son, Barber was sitting in a rocking chair and "staring at her, kind of inappropriately."

These incidents occurred prior to Mary Doe's reporting Barber's sexual abuse of her to police, and Barber's son was not aware at that time that Barber had sexually abused Mary Doe.

      c. *After Barber's arrest, Jane Does 1 and 2 were interviewed by a professional at the Children's Assessment Center; both denied having been molested*

After Barber was arrested for molesting Mary Doe, someone in law enforcement told Barber's son not to discuss the matter with Jane Does 1 and 2 and not to ask them whether they had been molested, so as not to "influence the girls one way or another." Instead, in or around January 2017, Jane Does 1 and 2 were interviewed at the Children's Assessment Center. The interviewer asked Jane Doe 1 "generally, has anyone done anything" to her, but did not specifically ask her whether Barber had ever sexually abused her. Jane Doe 1 "was scared," and told the interviewer that no one "had done anything to [her]." An interviewer asked Jane Doe 2 whether she had been touched inappropriately. She told the interviewer that she had not been

7

touched inappropriately because she did not want anyone to think "she is so gross." The interviewer did ask Jane Doe 2 whether Barber had touched her inappropriately, but she "didn't want to talk about it at that time."

### d. *Jane Does 1 and 2 disclose Barber's sexual abuse to family members*

Around December 2019, approximately three years after Barber was arrested for molesting Mary Doe, Barber's wife and son told Jane Does 1 and 2 that the reason that Barber was in prison was because he had sexually molested their aunt, Mary Doe. Jane Doe 1 recalled being "shocked" because she thought "it just only happened to [her] and Jane Doe 2." After Barber's molestation of Mary Doe was disclosed to Jane Does 1 and 2, the girls talked with each other privately. Jane Doe 1 told Jane Doe 2 that she was going to divulge that Barber had sexually molested Jane Doe 1. Jane Doe 2 asked Jane Doe 1 not to say anything about what he had done to Jane Doe 2.

Later that day, Jane Doe 1 went to her grandmother and told her that Barber had, in fact, touched her inappropriately. Jane Doe 1 testified that she finally disclosed the abuse because she had been keeping it all inside and was "at [her] breaking point." Jane Doe 1 thought that her grandmother did not believe her at first, but her grandmother hugged her and told her it would be "okay."

Approximately 20 minutes later, Jane Doe 2 also revealed to her grandmother that Barber had touched her inappropriately. Jane Doe 2 testified that she got to the point of being willing to tell her grandmother because she felt like "they would have believed me" because "it [had] happened to somebody else[,]" as well. Jane Doe 2's grandmother hugged both girls and said, "[I]t's not your fault."

8

Barber's wife told her son, the girls' father, what the girls had told her. The girls also disclosed the abuse to their father at a later time. When the girls told their father about the abuse, they were "really quiet" and appeared to be "really ashamed of themselves." Barber's son felt angry at Barber and himself. However, neither the girls' grandmother nor their father reported Barber's abuse of the girls to police. The girls' father testified that he wanted to protect them from "more trauma" that could result from "this trial process" and because he knew "it was going to be their word versus [Barber's]."

Mary Doe testified that she did not learn about Barber's sexual abuse of Jane Does 1 and 2 until August 2020. According to Mary Doe, she was babysitting the girls and another niece when the two girls started crying and told her they wanted to talk to her about something upstairs in their room. Once upstairs, the girls revealed to Mary Doe that Barber had sexually abused them.[2]

After she learned about the abuse from Jane Does 1 and 2, Mary Doe confronted her brother and mother. Mary Doe told them that she was aware that Jane Does 1 and 2 had disclosed the sexual abuse months earlier and yet their grandmother and father, Mary Doe's mother and brother, had done nothing about it. Mary Doe told her brother that doing nothing was not helping the girls.

Later that week, with her brother's approval, Mary Doe took Jane Does 1 and 2 to a police station. Jane Doe 1 testified that she wanted to go to

---

[2]     Jane Doe 1 recalled her first disclosure to Mary Doe differently. According to Jane Doe 1, approximately two months after the girls disclosed the abuse to their grandmother and father, Mary Doe walked in on Jane Doe 1 cutting herself with a razor in her bedroom. Mary Doe began talking with Jane Doe 1 about why she was harming herself. Jane Doe 2 came into the room at some point, and the three of them had a discussion. Jane Doe 1 told Mary Doe that Barber had touched her "inappropriately."

the police station with her aunt that day because she "wanted [Barber] to get what he deserved for taking [her childhood] away from [her.]"

>    e. *Jane Does 1 and 2 participate in interviews at the Children's Assessment Center for a second time and disclose Barber's sexual abuse*

After Mary Doe took the girls to talk with police about the abuse, the same interviewer from the Children's Assessment Center who had interviewed them in January 2017 interviewed them again on December 10, 2020.[3]

Jane Doe 1 told the interviewer that she recalled having been interviewed in 2017, but she did not remember what she said during that interview. In this second interview, Jane Doe 1 described how Barber had sexually abused her from the time she was four or five years old. She disclosed that Barber touched her chest and vagina while they were in his bedroom and the garage, and that he told her not to tell anybody or something bad would happen. Jane Doe 1 told the interviewer that Barber would use either his hands or fingers, or his penis, to rub against her. She indicated that Jane Doe 2 was sometimes present while Barber was abusing Jane Doe 1 and would have to watch the abuse, and that Barber would sometimes abuse Jane Doe 2 in front of Jane Doe 1.

Jane Doe 1 also indicated to the interviewer that she sometimes slept in a bed with Barber and her grandmother, and that Barber sometimes abused her in the bed while her grandmother was sleeping. Jane Doe 1 also told the interviewer that Barber would call her into the garage, lock the door, and start to touch her inappropriately. Jane Doe 1 mentioned that sometimes her father would ask "why is the door [to the garage] locked," and

---

[3]    The video recordings of these interviews were played for the jury.

10

Barber would say that he "was just playing a game with [Jane Doe 1]." She believed that her father "didn't think anything of it."

Jane Doe 1 described various types of touching that occurred when Barber would move or remove her clothes. She explained how Barber touched himself while he abused her. She described how Barber would ejaculate when he did this. Jane Doe 1 explained that this conduct happened more than once, and said that Barber did these things while they were "in the room, the garage or in his truck."

Jane Doe 1 also recalled times when Barber would make her orally copulate him. She recalled that this happened more than once, and referred to various locations where it occurred, including outside of a grocery store or a Dollar Tree store, in the garage and in the bedroom. Jane Doe 1 also described incidents when Barber would orally copulate her.

Jane Doe 1 told the interviewer that Barber would make her and Jane Doe 2 watch pornography on his phone with him, and when someone came into the room, he would press a button to make it look like they were just listening to music. Jane Doe 1 indicated that Barber sometimes took photographs while he was abusing her.

Jane Doe 1 described to the interviewer how she decided to tell what had happened to her only after she had become depressed and suicidal and had been talking with a therapist. Jane Doe 1 had not even told the therapist what Barber had done to her. Jane Doe 1 was scared for herself and her sister when she learned that Barber would be released from prison, and she was concerned that he might move back into the home with her grandmother.

During Jane Doe 2's interview, Jane Doe 2 acknowledged that she had lied in 2017 when she denied that Barber had touched her inappropriately.

11

Jane Doe 2 explained that she was afraid that her family would get mad at her or would not love her anymore if she told them what had occurred. She proceeded to describe to the interviewer the ways in which Barber had sexually abused her for years.

For example, Jane Doe 2 described how Barber would make her orally copulate him. She also described how Barber would orally copulate her. She mentioned having witnessed Barber do these things with Jane Doe 1, as well, and she discussed having seen Barber touch Jane Doe 1 inappropriately with his hands and fingers. Jane Doe 2 told the interviewer, similar to what Jane Doe 1 disclosed in her interview, that Barber would make her and Jane Doe 1 watch sex videos on his tablet.

Jane Doe 2 described how Barber would sometimes touch her inappropriately while they were in the living room watching a movie or while she was taking a bath. Like Jane Doe 1, Jane Doe 2 also described instances of sexual abuse that occurred while she was in bed with Barber and her grandmother.

Jane Doe 2 also described incidents when Barber would commit sex acts with the girls while they were in a vehicle in a parking lot of a store, and indicated that during some of these incidents, Barber would ejaculate.

Jane Doe 2 told the interviewer that the abuse ended when Barber went to prison, which was just before she started fifth grade. She explained that no one initially told her or her sister why Barber was in prison; they finally told her the reason he was in prison in December 2019. Jane Doe 2 told the interviewer that after her grandmother and father told the girls that Barber had sexually abused Mary Doe, Jane Doe 1 told her grandmother that Barber had also molested them.

f. *The trial testimony of Jane Does 1 and 2*

At trial, Jane Doe 1 testified in a manner that was generally consistent with the statements she had made to the interviewer during her January 2017 interview. Jane Doe 1 testified that Barber touched her inappropriately "[q]uite often" while they lived at the house in Chino, starting when she was four years old and continuing until Barber went to prison, which was when Jane Doe 1 was about 10 years old. Jane Doe 1 explained that she and Jane Doe 2 would often sleep in their grandparents' bedroom, and that they would sleep on either side of Barber. She said that Barber would take her and her sister to buy toys and candy, and that he babysat them in the afternoons when their grandmother was at work. She indicated that Barber would touch her vagina with his fingers, and that this happened more than once, both over and under her clothes. She further stated that he touched her breasts more than once. Jane Doe 1 also testified that Barber would orally copulate her, and that this happened more than one time, and that he also would make her touch his penis with her hands. Barber also made Jane Doe 1 orally copulate him.

Jane Doe 1 testified that Barber would engage in this conduct when they were in the bedroom, garage, and the car. According to Jane Doe 1, Barber spent a lot of time working on the car in the garage, and the inappropriate touching often took place in the garage. On more than one occasion, Jane Doe 1's father tried to get into the garage while the door was locked when Barber and Jane Doe 1 were in the garage and Barber was abusing her.

Jane Doe 1 testified that on some occasions when Barber was touching her inappropriately, Jane Doe 2 was also present. Jane Doe 1 explained that she also witnessed Barber touch Jane Doe 2 inappropriately on multiple

13

occasions. Jane Doe 1 also explained that she and her sister were sometimes together when Barber would sexually abuse them in the car during a trip to get toys or candy.

Jane Doe 1 testified that after Barber engaged in sex acts with her, he would tell her not to tell anyone about it.

At trial, Jane Doe 2 testified that she could not remember the first time that Barber had touched her inappropriately, but she indicated that she was "really young" when the abuse started. According to Jane Doe 2, Barber sexually abused her "on a weekly basis" while they were living in the same house with him.

Jane Doe 2 testified that Barber would use his hands and fingers to touch her inappropriately, and would make her touch him inappropriately. Jane Doe 2 further testified that Barber made her orally copulate him, and she described incidents during which he orally copulated her. Jane Doe 2 indicated that these types of incidents happened "multiple times throughout" her childhood.

Jane Doe 2 indicated that at times, Jane Doe 1 would be in the garage while Barber sexually abused Jane Doe 2, but at other times Jane Doe 2 was alone with him. At trial, Jane Doe 2 testified in a manner similar to Jane Doe 1 about how Barber would touch her inappropriately while they were in his and her grandmother's bedroom, including times when she was in the bed with both Barber and her grandmother. Jane Doe 2 tried to wake up her grandmother by kicking her, but her grandmother remained asleep.

Jane Doe 2 testified that the inappropriate touching also occurred when the girls were in the bathtub together.

Jane Doe 2 testified that Barber would show the girls pornographic videos on his tablet before he would molest them. Jane Doe 2 testified that

14

most of the videos he showed them depicted adults engaged in sex acts, but one of the videos she remembered showed a child with her father. Jane Doe 2 indicated that the people in the videos were doing the same kinds of acts that Barber was doing with Jane Does 1 and 2.

Jane Doe 2 testified that Barber told her not to tell anyone about the touching "or else," and even though he "was calm about it," she nevertheless felt scared that he would do something bad to her or her sister. Jane Doe 2 also testified that she did not tell anyone about the sexual abuse because she was scared that everyone would think of her "differently" and that they would think that what was happening to her was her fault.

2. *The defense*

The defense called as a witness the detective who was assigned to Mary Doe's case in 2016. The detective testified that Barber's electronic devices were searched in 2016 and 2017, and at that time law enforcement officers found no pornography or photographs of other victims. The detective also confirmed that Jane Does 1 and 2 participated in forensic interviews after Mary Doe's disclosure in an effort to determine whether they were also victims of Barber's sexual abuse.

In the course of presenting this evidence, Barber's attorney played four video recordings of the interviews of Jane Does 1 and 2 for the jury. In the first interview, which took place on November 2, 2020, Jane Doe 1 discussed Barber's sexual abuse with officers from the Chino Police Department. The second interview played for the jury was Jane Doe 2's interview with officers on the same date. The other two videos defense counsel played for the jury were the interviews of Jane Does 1 and 2 by an interviewer at the Children's Assessment Center on January 3, 2017. During these interviews, both girls denied that anyone had ever touched them inappropriately.

15

Barber also testified in his own defense. Barber admitted that he had sexually abused Mary Doe, just as she testified. He denied, however, that he had sexually abused Jane Does 1 and 2. According to Barber, while he did take the girls to the store and buy them things and "spoil them," he did not commit sex acts with them. Barber also claimed that he could not have abused them in the garage during the afternoon, as the girls had testified, because he was not at the house then. According to Barber, contrary to the testimony of Jane Doe 1 and Jane Doe 2, his wife would have been home between 3:00 p.m., when the girls got out of school, and 6:00 p.m.

When asked why he thought Jane Does 1 and 2 had made sexual abuse allegations against him, Barber theorized that his daughter, Mary Doe, was "manipulating them" because she was "pissed off" that he was being released from prison much earlier than she had expected.

Nevertheless, Barber admitted on cross-examination that he had tried to minimize his behavior with respect to Mary Doe by telling her in their pretext telephone call that his abuse against her had lasted for only weeks or months, rather than years. He also conceded that, although he did not recall having done so, he had told Mary Doe seven times during the telephone call that he had engaged in inappropriate conduct with her because it excited him. He also had to concede that he had told the investigating officer the same thing at least six times, and that he told investigators that Mary Doe seemed to like the abuse. Barber acknowledged that he did not engage in further touching of Mary Doe after she started to grow pubic hair. Further, Barber admitted that after he stopped molesting Mary Doe, he would search for what he referred to as "daddy porn" and "baby-sitter porn" because he "still had that urge that [he] couldn't fulfill with Mary Doe anymore," and because it was difficult to stop doing something that "excited [him] so much."

16

Barber had told a detective that he believed that the girls who appeared in the pornography he watched "looked very young, but they were actually older." He admitted that the girls looked "ten and eleven," and that girls that age were "part of [his] sexual preference."

B. *Procedural background*

The San Bernardino County District Attorney filed an information charging Barber with 10 counts of sexual penetration or oral copulation with a child 10 years old or younger (Pen. Code,[4] §§ 288.7, subd. (b); counts 1-4, 12-17), one count of sexual intercourse with a child 10 years old or younger (§§ 288.7, subd. (a), 1170, subd. (h)(3); count 5), and 12 counts of committing a lewd act upon a child under age 14, (§§ 288, subd. (a), 667.71, 667.61, subds. (j)(2), (e), 1170, subd. (h)(3); counts 6-11, 18-23). The information also included sentencing enhancement allegations, including that Barber was previously convicted of violating section 288.5 and was therefore a habitual sex offender under section 667.71, and that he committed the offenses against multiple victims under the age of 14, under section 667.61, subdivisions (j)(2) and (e).

A jury convicted Barber on all counts except counts 5 and 17 and found true the multiple victim enhancements. Barber admitted having suffered the alleged prior conviction under section 667.71.

The trial court sentenced Barber to a total term of 110 years to life in prison.

Barber filed a timely notice of appeal.

---

4       Further statutory references are to the Penal Code unless otherwise indicated.

17

## DISCUSSION

A. *Barber's contentions related to the admission of evidence that he contends amounted to evidence of Child Sexual Abuse Accommodation Syndrome (CSAAS)*

Barber raises five arguments related to the trial court's decision to allow the prosecution to elicit testimony from a police detective regarding his training and experience with respect to the manner in which child sexual abuse victims tend to disclose the abuse. Specifically, the court permitted the detective to testify concerning the delay in disclosure that often occurs, as well as the fact that child victims sometimes initially provide incomplete or inconsistent statements and slowly recall details over time. Four of Barber's arguments relate to why he believes the trial court abused its discretion in allowing Trosper to testify as to these subjects. In his fifth argument, Barber contends that even if the trial court did not err in admitting this evidence, the court erred in failing to provide an instruction limiting the jury's use of this evidence.

1. *Additional background*

Chino Police Department Detective Scott Trosper testified as an expert witness for the prosecution. At the time of trial, Trosper had been a police officer for 20 years, two of which he spent as a detective. He had investigated over 100 child sexual abuse cases, and had directly interviewed or observed interviews of between 50 and 60 child victims.

The prosecutor asked Detective Trosper whether, based on his training and experience, it was common for child victims of sexual abuse not to report the abuse immediately after it first occurred, or to initially deny the abuse when first asked about it. Trosper indicated that in his experience, this was "absolutely" common. Trosper also testified that, based on his training and

18

experience, it is common for children who have been sexually abused to continue to spend time with their abuser.

Detective Trosper stated that in his experience with child sexual abuse cases, it is typical for a child victim to be interviewed or questioned by several different people, such as police officers, a forensic interviewer, someone from the Children's Assessment Center, and later, by individuals in a court setting. When asked about his experience with investigations of child sexual abuse and whether child victims typically "disclose every single detail to every single person who interviews them," Detective Trosper answered, "No." He noted that child victims have "memories [that] are sometimes clouded," such that while a victim might remember one incident "extremely clearly," the victim's memory of another incident or other incidents might be more vague. Also, a child might have a clearer memory of a particular incident when interviewed on a different occasion.

Detective Trosper's expert testimony regarding the things that he had learned through his training and experience with respect to child sexual abuse victims and their disclosures of the abuse comprises approximately three pages of reporter's transcript. After Detective Trosper provided testimony regarding his training and experience regarding disclosures made by child sexual abuse victims, generally, he was questioned about his involvement in the investigation into Barber's abuse of Jane Does 1 and 2, and what investigators learned from the interviews of the two girls at the Children's Assessment Center. This testimony comprises approximately 20 pages of reporter's transcript; in addition, the prosecutor played video recordings of the girls' interviews for the jury during Detective Trosper's testimony. Detective Trosper was not asked to express his opinion as to

19

whether the disclosures made by Jane Does 1 and 2 comported with the typical modes of disclosure by child sexual abuse victims as a class.

2. *Analysis*

a. *Barber's challenges to the admissibility of Detective Trosper's expert testimony*

The first four arguments set out in Barber's opening brief challenge the trial court's admission of Detective Trosper's expert testimony regarding the nature of disclosures of sexual abuse by child victims of such abuse.

i. *Defense counsel failed to object to the admission of the expert testimony on any of the grounds raised on appeal, and thereby forfeited these contentions*

The People point out that Barber failed to object to the prosecutor's questioning of Detective Trosper regarding his experience with child victims of sexual abuse on any of the grounds that he raises on appeal, and that as a result Barber has forfeited these contentions. We agree.

A judgment shall not be reversed based on the erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353, subd. (a).) The failure of counsel to state a timely and *specific* objection on the same ground raised on appeal forfeits that ground. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20-22 (*Demetrulias*); *People v. Partida* (2005) 37 Cal.4th 428, 433-434 (*Partida*).) " 'The reason for the requirement [that a specific objection must be made] is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay

20

additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' " (*Partida*, at p. 434.)

Barber did not object to Detective Trosper's expert testimony on any of the grounds that he raises on appeal. While Barber's attorney did object four times during this portion of Detective Trosper's testimony, none of the objections mentioned or even touched on the grounds raised on appeal. First, when the prosecutor asked Detective Trosper, "And have you also spoken to children who initially deny being molested the first time they're spoken to, and then later disclosed sexual abuse?", defense counsel objected on the grounds that the question was "[l]eading and outside the scope of his expertise." The trial court overruled the objection.

Second, defense counsel objected to the following question on the ground that it was "leading": "And based on your training and experience, is it common for a victim, a child victim, to not disclose some of the abuse?" The trial court sustained this objection and the prosecutor rephrased the question to ask, "Based on your training and experience, can you talk about how disclosures can be made when there [are] multiple interviews?" Third, in response to a question about how disclosures might be made when a victim is interviewed multiple times, Detective Trosper responded, "These interviews are obviously difficult for the children, and their memories are sometimes clouded, at least in my experience." Defense counsel objected on the ground that the detective's answer involved "[s]peculation." The trial court overruled this objection and permitted Detective Trosper's answer to stand, and also allowed Detective Trosper to complete his answer.

Finally, defense counsel objected on relevance grounds when Detective Trosper began to discuss the facts of a different, "current" case on which he was working. The trial court sustained the relevance objection and

21

admonished Detective Trosper to answer in generalizations and to avoid discussing other cases.

A review of these objections demonstrates that Barber's attorney did not object to Detective Trosper providing his opinions, based on his training and experience, about how child victims of sexual abuse tend not to disclose the abuse right away and sometimes disclose in bits and pieces over time. Nevertheless, in his reply brief, Barber suggests that the "thrust" of his attorney's objections was "that Trosper's testimony concerning the way . . . child sexual abuse victims commonly act could not reliably be used by the jury in reaching a verdict in this case." As we have described, the record does not support Barber's characterization of his trial counsel's objections. It is therefore clear that Barber has forfeited the arguments that he raises on appeal regarding the admission of Detective Trosper's expert opinions about the nature of child sexual abuse victims' disclosures.

ii. *Even if not forfeited, Barber's challenges fail on the merits*

In any event, even if not forfeited, Barber's contentions challenging the trial court's admission of Detective Trosper's expert opinion on child sexual abuse victim disclosure patterns are without merit.

A. Kelly

In his first argument, Barber contends that Detective Trosper's testimony amounted to evidence equivalent to testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS), and that as such, Detective Trosper's expert testimony must meet the same requirements as CSAAS testimony in order to be admissible. He asserts, that CSAAS

22

testimony should be subjected to the test for a new scientific method or theory, as set out in *Kelly, supr*a, 17 Cal.3d 24, in order to be admissible.[5]

---

[5]    The People dispute that Detective Trosper's testimony should be considered to be CSAAS evidence. According to the People, "Detective Trosper did not testify about CSAAS," and his testimony was limited instead "to his own personal observations on the topic of disclosure based on other cases he had investigated." The People contend that under Evidence Code section 720, subdivision (a), a trial court may permit a person "to testify as an expert if [the individual] has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates," and that the trial court's determination that Detective Trosper qualified as an expert about child sexual abuse victim disclosures during investigative interviews is subject to review for an abuse of discretion and should not be disturbed. According to the People, the trial court did not abuse its discretion in permitting Detective Trosper to testify regarding the disclosure patterns of child victims based on his many years of training and experience in both interviewing victims and observing others interview them while investigating child sexual abuse cases.

Although we agree that permitting a detective to testify regarding a topic for which he or she has particularized training and experience does not offend the normal rules for admitting expert testimony, many of the same concerns that courts have addressed with respect to the admission of CSAAS evidence through experts in the mental health field exist with respect to Detective Trosper's testimony. Trosper testified in general terms about common myths and misconceptions regarding how child sexual abuse victims tend to report or disclose the abuse, including observations that victims often initially deny having been abused, and that their disclosures may occur at different times and over a lengthy period of time. As such, portions of Detective Trosper's testimony were, effectively, consistent with CSAAS research and theory. (See, e.g., *People v. Bowker* (1988) 203 Cal.App.3d 385, 389 & fn. 3 (*Bowker*) [first articulated in 1983, CSAAS has five stages— secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction].) We therefore assume that Detective Trosper's testimony was, effectively, akin to CSAAS evidence and will therefore address Barber's contentions on the subject. However, to the extent that certain of Barber's arguments highlight the distinction between a detective testifying as an expert based on his professional experience and observations and a clinician testifying as an expert about the common behaviors of child molestation

23

We disagree with Barber's contention that the admissibility of Detective Trosper's expert opinions regarding child victim disclosures should have been assessed under the *Kelly* rule, and that, under proper application of that rule, the testimony should have been excluded.

The *Kelly* rule "conditions the admissibility of evidence based on a new scientific method of proof on a showing that the technique has been generally accepted as reliable in the scientific community in which it developed." (*People v. Shirley* (1982) 31 Cal.3d 18, 34.) The rule applies "only to expert testimony 'based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.' " (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 173 (*Lapenias*).) Additionally, the rule applies only if "the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury. The most obvious examples are machines or procedures which analyze physical data." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156.)

The argument that Barber puts forward has been rejected by other courts, including recently in *Lapenias, supra*, 67 Cal.App.5th at p. 173. The *Lapenias* court explained, "[T]he theory of CSAAS is not new. [Citation.] Further, CSAAS testimony does not purport to provide a definitive truth; rather, the expert testimony attempts to disabuse jurors of misconceptions they might hold about the conduct of children who have been sexually abused. In short, expert CSAAS testimony is not ' " 'scientific' " evidence' subject to the *Kelly* rule." (*Ibid.*) We agree with this analysis. (See also

victims based on scientific or academic research or theories (i.e., "typical" CSAAS evidence), we will acknowledge that distinction.

24

*People v. Munch* (2020) 52 Cal.App.5th 464, 472-473 (*Munch*) [rejecting challenge to CSAAS evidence under the *Kelly* rule].)

In addition, the fact that Detective Trosper was testifying about his *own experiences and observations* of child sexual abuse victims demonstrates that there was no reason to assess this particular expert testimony under *Kelly*.  Detective Trosper was not testifying about a psychological syndrome, theory, or method; instead he discussed his own observations of child sexual abuse victims' disclosures of that abuse, all of which were based solely on his many years of training and experience with respect to child sexual abuse investigations.  Expert testimony based on an individual's professional experience, when presented without reference to a diagnosis or defined syndrome or any other scientific or academic method, is not likely to mislead a jury based on an aura of *scientific* infallibility, and is not subject to the " 'additional screening procedures' " of the *Kelly* test.  (See *Munch, supra*, 52 Cal.App.5th at p. 473.)

In setting out the argument that CSAAS evidence should be subject to a *Kelly* analysis, Barber also contends that the trial court's admission of Detective Trosper's expert testimony regarding child sexual abuse disclosure patterns, without application of the *Kelly* rule for establishing its reliability, violated due process because it "rendered [the] trial fundamentally unfair." Barber acknowledges that this argument has been rejected by other courts (see *People v. Patino* (1994) 26 Cal.App.4th 1737, 1747-1748 ["[I]ntroduction of CSAAS testimony does not by itself deny appellant due process"]), but, he argues, the *Patino* court's reliance on *Estelle v. McGuire* (1991) 502 U.S. 62, 72, which involved the admission of evidence regarding battered child syndrome, provides an inapt analogy and undermines the *Patino* court's analysis.  We are not persuaded that Barber's challenge to *Patino* is correct;

other courts agree with our assessment, in that they have rejected the notion that the admission of evidence regarding CSAAS, even without a *Kelly* analysis, violates due process.  (See *Lapenias, supra*, 67 Cal.App.5th 162, 174; *Munch, supra*, 52 Cal.App.5th at p. 470.)  We see no basis to depart from the conclusion reached by these courts.  A trial court's compliance with the rules of evidence typically does not violate a defendant's right to due process (see *People v. Hall* (1986) 41 Cal.3d 826, 834-835).

B.  *Evidence Code section 801 does not render CSAAS evidence inadmissible*

Barber next contends that CSAAS evidence should be excluded for all purposes under Evidence Code section 801.  He argues that Evidence Code section 801, subdivision (b) limits an expert's testimony to opinions that are " '[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates.' "  "Trial judges have a critical gatekeeping function when it comes to expert testimony beyond merely determining whether the expert may testify at all.  Expert evidence that does not require a *Kelly* analysis must still be admissible under Evidence Code section 801, which mandates it be 'of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject.' [Citations.]" (*People v. Azcona* (2020) 58 Cal.App.5th 504, 513.)

Relying on out-of-state authority, Barber asks this court to conclude that CSAAS evidence is not sufficiently reliable to be admitted for any purpose under Evidence Code section 801.  (See *Blount v. Commonwealth* (Ky. 2013) 392 S.W.3d 393, 395; *Commonwealth v. Dunkle* (Pa. 1992) 602 A.2d 830; *State v. Ballard* (Tenn. 1993) 855 S.W.2d 557, 562; *State v. J.L.G.* (2018) 234 N.J. 265, 90 A.3d 442, 446; *Hadden v. State* (Fla. 1997) 690 So.2d 573-578.)  However, our Supreme Court has expressly approved

the admissibility of CSAAS evidence for certain purposes in *People v. McAlpin* (1991) 53 Cal.3d 1289, and we are bound by that precedent. (*Auto Equity, supra*, 57 Cal.2d at p. 455.) Other California courts have consistently found expert testimony about CSAAS admissible based on the authority of *McAlpin*. (See, e.g., *Munch, supra*, 52 Cal.App.5th at p. 468; *Lapenias, supra*, 67 Cal.App.5th at p. 172.) Out-of-state authorities provide us no compelling reason to depart from established California precedent.

<div style="margin-left: 30%;">

C. *Detective Trosper's expert testimony was not irrelevant on the ground that the public no longer harbors misconceptions about the manner in which child sexual abuse victims disclose the abuse*

</div>

Barber also argues that the trial court should have excluded Detective Trosper's expert testimony regarding his experiences concerning how child sexual abuse victims disclose abuse because there is no longer a need to dispel misconceptions harbored by laypersons about the behavior of victims of sexual abuse—the purpose for which such evidence has been held to be admissible. Specifically, Barber contends that the public "no longer harbors misconceptions about the behavior of sexually abused children." (Boldface and capitalization omitted.) We disagree with this assertion.

The appellate court in *Munch, supra*, 52 Cal.App.5th 464 addressed a similar argument and rejected it. The defendant in *Munch* argued that CSAAS evidence "is irrelevant and 'the public no longer holds the presumed misconceptions this testimony purports to address.'" (*Id.* at p. 468.) The *Munch* court disagreed with this contention. (*Ibid.*) Barber again offers out-of-state authority to argue that "[c]ourts and commentators have questioned whether the public continues to hold misconceptions about the behavior of children who have been molested." We see no reason to depart from the

27

holding in *Munch*. We are not persuaded that expert evidence regarding the behavior of child sexual abuse victims does not retain value in disabusing jurors of misperceptions or misunderstandings with respect to the behaviors of a child surrounding sexual abuse, including delayed or disjointed disclosure of the abuse.

### D. *Detective Trosper's expert testimony did not "provide a 'profile' of a child abuse victim"*

Barber's final contention related to the admission of Detective Trosper's testimony regarding common patterns of disclosure in child sexual abuse victims is that the trial court erroneously permitted the detective to provide testimony that "allowed the jury to apply the syndrome to the facts of the case and conclude that both [Jane Doe 1] and [Jane Doe 2] were sexually abused," rather than for the acceptable limited purpose of disabusing the jury of preconceived ideas of how a sex abuse victim might act. According to Barber, CSAAS evidence may not be "used to provide a 'profile' of a child abuse victim." Barber complains that Detective Trosper "testified in a way that closely tracked the facts of this case," and he relies on authority that cautions that where a trial court permits an expert to give what appears to be " 'general' testimony describing the components of [CSAAS]" (*Bowker, supra*, 203 Cal.App.3d at p. 393) in a way that too closely tracks the case, the jury might draw "predictive conclusions" (*ibid.*) and use the testimony to determine that the complaining victim was, in fact, sexually abused.

After viewing Detective Trosper's expert testimony as a whole, we are not convinced that the jury was likely to misuse his testimony to conclude that Jane Does 1 and 2 were sexually abused. First, and contrary to Barber's assertion otherwise, Detective Trosper did not "describe[ ] CSAAS" at all, in that he did not purport to set forth a clinical or other psychological theory to

explain a variety of behaviors of child victims. Thus, Detective Trosper's testimony did not suggest to the jury that it was based on any scientific or academic authority. Rather, the detective offered his professional experience about the manner in which the sexual abuse victims whom he had observed tended to disclose the abuse. Testimony regarding his observations of patterns in sexual abuse victims' often delayed disclosures, inconsistent statements, and disjointed memories of the abuse addressed jurors' possible misconceptions that these circumstances might indicate that a victim was fabricating the asserted abuse. Detective Trosper properly assisted the jury in understanding that it is not uncommon for victims to delay the reporting of sexual abuse and that it is also not uncommon for victims' initial disclosures to lack details or to be inconsistent with later versions. Further, the detective's expert testimony regarding victims' delayed disclosure and the manner of disclosure was presented in general terms regarding *typical* cases and did not closely track the facts of this case. That some of Detective Trosper's general observations about child sexual abuse victims' disclosures, as a class, were also reflected in the evidence of the disclosures of Jane Does 1 and 2 does not mean that Detective Trosper engaged in improper "profiling." Instead, it demonstrates that the disclosures of the two victims in this case were not inconsistent with disclosures by other victims of sexual abuse of which Detective Trosper was aware. Detective Trosper's testimony did not suggest that anyone could conclude that the two victims in this case had been abused, based merely on their lack of immediate disclosure and the existence of inconsistent disclosures over time. Nor did his testimony suggest that Jane Does 1 and 2 were being truthful. Rather, Detective Trosper's testimony served to prevent jurors from misapprehending that the presence

29

of such factors necessarily indicated that Jane Does 1 and 2 had fabricated the abuse.

> b. *Reversal is not required based on the lack of an instruction limiting the use of Detective Trosper's expert testimony regarding his experience with respect to child sexual abuse victim disclosure patterns*

Barber contends that the trial court erred in failing to instruct the jury as to the limited way in which it was permitted to use CSAAS evidence.[6] The People respond by asserting that Barber has forfeited this contention for purposes of appeal by failing to object to the trial court's instruction with respect to Detective Trosper's expert testimony. Barber contends, however, that this court may consider his argument on appeal because, to the extent his trial counsel failed to seek a limiting instruction or object to the court's instructions, his attorney rendered ineffective assistance, warranting reversal of his convictions. The People assert that Barber cannot demonstrate either that his attorney's performance with respect to failing to request a limiting instruction was deficient, or that there is a reasonable probability that, but for the purportedly deficient performance, the result of the trial would have been different. We address these contentions in turn.

> i. *Additional background*

Near the end of trial, the trial court and the attorneys discussed the proposed jury instructions. The court indicated its intention to "go through" the packet of instructions provided by the prosecution and indicate whether the court intended to give, not give, or give a modified version of each

---

[6] Barber does not specify whether he believes that the pattern instruction (CALCRIM No. 1193) should have been given, or whether he believes that the court should have devised an instruction tailored to Detective Trosper's testimony.

proposed instruction. The court stated, "Please stop me, ask me to go back, interrupt me if you have any input. If I don't hear from you, that means you have no objection." The court also told the attorneys to indicate whether they believed that additional instructions were needed after the court concluded its review of the packet of instructions that the prosecutor proposed.

During the discussion, the court indicated that it intended to give CALCRIM No. 332, regarding expert witness testimony, in light of Detective Trosper's expert testimony. Defense counsel did not object to this instruction, nor did counsel request a limiting instruction. At the end of the discussion, the court asked defense counsel whether she wanted to request any additional instructions; defense counsel replied, "Not at this time." The following morning, defense counsel indicated that she had no comments or changes to the revised instructions.

The trial court instructed the jury on the use of expert witness testimony in a manner consistent with CALCRIM No. 332:

> "A witness was allowed to testify as an expert and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion is for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate.
>
> "You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

ii. *Analysis*

> A. *Courts do not have a sua sponte duty to provide an instruction limiting the use of CSAAS evidence; Barber's failure to request a limiting instruction forfeits his claim on appeal*

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.]" (*People v. Najera* (2008) 43 Cal.4th 1132, 1136.) An appellate court reviews independently the issue of whether a trial court has a duty to give a particular jury instruction. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

The Legislature has determined that *limiting* instructions need not be given sua sponte. "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." (Evid. Code, § 355.) Thus, it has been repeatedly stated that " '[a]bsent a request, a trial court generally has no duty to instruct as to the limited purpose for which evidence has been admitted.' [Citation.]" (*People v. Murtishaw* (2011) 51 Cal.4th 574, 590; see, e.g., *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051-1052; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088, fn. 5 (*Humphrey*); *People v. Collie* (1981) 30 Cal.3d 43, 63; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1316-1317.)[7]

---

[7] A " 'possible' narrow exception" to this rule may occur in the " ' "occasional extraordinary case" ' " in which the evidence ' "is a dominant part of the evidence against the accused, and is both highly prejudicial and

Pursuant to statute, only one instruction need be given sua sponte with respect to expert testimony: "When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury substantially as follows: [¶] Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable. [¶] *No further instruction on the subject of opinion evidence need be given.*" (§ 1127b, italics added.)

The trial court instructed the jury consistent with the requirements of section 1127b by providing the jury with the pattern instruction on expert testimony, CALCRIM No. 332. Under section 1127b's terms, no further limiting instruction on the use of expert testimony—even expert testimony touching on common patterns in the disclosure of child sexual abuse—was required. Barber contends, however, that appellate courts "are divided on whether a trial court is required to sua sponte give a limiting instruction when expert testimony on CSAAS is introduced at trial." He contends that the "better, and more modern, view is that when a court admits CSAAS testimony, it must instruct the jury sua sponte that it may not use the evidence to determine whether the victim's claims are true." We disagree with Barber's assessment of the state of the law.

---

minimally relevant to any legitimate purpose." ' [Citations.]" (*People v. Murtishaw, supra*, 51 Cal.4th at p. 590.)

One of the most recent published cases to have considered this issue, *People v. Mateo* (2016) 243 Cal.App.4th 1063 (*Mateo*), discusses the purported division on the question of a sua sponte duty of the court to provide a limiting instruction on CSAAS evidence and concludes that only a single published case, *People v. Housley* (1992) 6 Cal.App.4th 947, 957 (*Housley*), has expressly determined that a trial court has a sua sponte duty to provide a limiting instruction regarding the use of CSAAS evidence. (See *Mateo*, at pp. 1072-1073.) The *Mateo* court explained that although one other decision could be interpreted as being "arguably consistent with *Housley*," that opinion "does not expressly discuss the point" whether a limiting instruction is required to be given sua sponte. (*Id.* at p. 1073, citing *Bowker, supra*, 203 Cal.App.3d at p. 394.) The *Mateo* court further noted that "[a]ny doubt as to the intent of the *Bowker* court has been eliminated, because the same court that decided *Bowker* held in three subsequent cases that the limiting instruction must be given [only] 'if requested.' " (*Mateo*, at p. 1073, quoting and citing *People v. Stark* (1989) 213 Cal.App.3d 107, 116; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 735; *People v. Bothuel* (1988) 205 Cal.App.3d 581, 587-588.)

Moreover, as the *Mateo* court discusses, the *Housley* approach is "at odds with our Supreme Court's decision in *Humphrey, supra*, 13 Cal.4th 1073," in which the Supreme Court "repeatedly referred to the trial court's duty to give a limiting instruction on the use of battered women's syndrome evidence on request." (*Mateo, supra*, 243 Cal.App.4th at p. 1073, citing *Humphrey*, at p. 1088, fn. 5, pp. 1090-1091 (conc. opn. of Baxter, J.), and p. 1100 (conc. opn. of Brown, J.).) "The majority opinion in *Humphrey* does not require a sua sponte limiting instruction on the use of evidence of battered women's syndrome; it suggests that an instruction would be

34

discretionary on request:  'If the prosecution offers the battered women's syndrome evidence, an additional limiting instruction *might* also be appropriate on request, given the statutory prohibition against use of this evidence "to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." [Citations.]'  [Citation.]" (*Mateo*, at p. 1073.) After concluding that "[b]attered women's syndrome is analogous to CSAAS," in that "[b]oth syndromes explain that victims' 'seemingly self-impeaching' behaviors . . . are consistent with their claims of having been [victimized]," the *Mateo* court decided that there is "no reason why a duty to instruct should be imposed in [the CSAAS] situation and not the [battered women's situation.]." (*Ibid.*)  Thus, *Mateo* holds that a limiting instruction regarding CSAAS evidence "need only be given if requested." (*Id.* at p. 1074.)

We find the *Mateo* court's analysis persuasive and conclude that a trial court does not have a sua sponte duty to provide a limiting instruction to the jury on the permissible use of CSAAS or related evidence, such as the testimony provided by Detective Trosper in this case.  If Barber wanted the court to instruct the jury as to the proper use of Detective Trosper's testimony, it was incumbent on Barber to request a limiting instruction.  His failure to do so results in the forfeiture of his contention that the trial court erred in failing to provide a limiting instruction.  (See, e.g., *People v. Pineda* (2022) 13 Cal.5th 186, 238, fn. 29 [argument that failure to provide limiting instruction permitted jury to use evidence for improper purposes was forfeited by failure to request such an instruction in the trial court]; *People v. Vang* (2022) 82 Cal.App.5th 64, 92 [defendant's failure to request a limiting instruction or remind court of need for one prior to jury deliberations resulted in forfeiture of claim of instructional error].)

Barber asserts that if this court concludes that the trial court did not have a sua sponte duty to provide an instruction limiting the use of Detective Trosper's expert testimony, then we should conclude that his trial counsel's failure to request such an instruction constituted ineffective assistance of counsel.

Under *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*), a defendant must demonstrate that trial counsel's performance was deficient, and that this deficient performance resulted in prejudice, in order to prevail on a claim of ineffective assistance of counsel. (*Id.* at p. 687.) With respect to the performance prong, a reviewing court "indulge[s] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (*id.* at p. 689), and measures an attorney's performance against an "objective standard of reasonableness" (*id.* at p. 688). In order to establish that defense counsel rendered deficient performance under *Strickland*, a defendant must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Id.* at p. 687.) "On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.] '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal *unless there could be no conceivable reason for counsel's acts or omissions.*'" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165, italics added; *People v. Cunningham*

36

(2001) 25 Cal.4th 926, 1003 ["deficient performance [must be] based upon the four corners of the record"].) Therefore, without some indication in the record that counsel's decision was not tactical, a reviewing court is not justified in finding deficient performance on direct appeal. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267; see also *People v. Scott* (1997) 15 Cal.4th 1188, 1212 ["If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation"].)

With respect to the prejudice prong, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694.) A defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." (*Id.* at p. 693.) Rather, a defendant must show "a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

The record in this case sheds no light on why trial counsel did not request CALCRIM No. 1193 or another instruction limiting the use of Detective Trosper's expert testimony. Given the lack of any indication of the reason for counsel's omission, Barber cannot prevail on this claim unless there could be no conceivable reason for failing to request a limiting instruction. However, there is at least one conceivable reason why trial counsel may not have requested a limiting instruction: "[C]ounsel could rationally conclude that it would be counterproductive to request an instruction highlighting expert testimony supporting the victim's credibility." (*Mateo, supra*, 243 Cal.App.4th at p. 1076; see *People v. Maury* (2003) 30 Cal.4th 342, 394 ["A reasonable attorney may have tactically concluded

that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide"].)

Further, Barber has not sufficiently demonstrated that there is a reasonable probability that, but for counsel's purported error in failing to request a limiting instruction, he would have obtained a different result. (See *Strickland, supra*, 466 U.S. at p. 694.) Detective Trosper's expert testimony was brief when considered in the context of the entire trial. The direct evidence against Barber was strong, in that both Jane Doe 1 and Jane Doe 2 described abuse that was similar in striking ways to the abuse that Barber admitted he had committed against Mary Doe. The girls both also seemed to know details about various sexual acts, and their descriptions of the abuse was often technically accurate and realistic. And, while the girls' recollections of the abuse may have involved inconsistencies at the margins, their stories were generally quite consistent. Other witnesses described events that supported the girls' testimony, such as an incident during which the garage door was locked while Barber and one of the girls were inside, and despite Barber's son's knocking, it took Barber a long time to open the door. Moreover, Barber conceded that he continued to harbor a "sexual preference" for girls who appeared to be ten or eleven years old, and admitted that he continued to seek out and view pornography that was thematically consistent with that preference. Given this record, our confidence in the outcome is not undermined by the lack of a limiting instruction regarding the proper use of Detective Trosper's expert testimony.

In sum, we conclude that Barber's contention that his trial counsel rendered ineffective assistance in failing to request a limiting instruction regarding the proper use of Detective Trosper's expert testimony is without merit.

B. *Barber's contention regarding the trial court's decision to reopen closing arguments*

### 1. *Additional background*

The attorneys for the parties presented closing arguments on Friday, June 11, 2021. Because it was late in the day when the attorneys completed their closing arguments, the trial court sent the jury home for the weekend upon the conclusion of the arguments rather than providing jury instructions at that time.

On Monday, June 14, the trial court instructed the jury, and the jury began its deliberations.

Two days later, on June 16, the trial court requested that the parties appear in court to discuss how the court should respond to questions submitted by the jury. The jury had asked for transcripts of the video recordings, as well as a readback of the testimony of Jane Doe 1, Jane Doe 2, Mary Doe, and Barber. Before the readback of the requested testimony was completed, the jury sent a note to the court asking, "What do we do if we can't agree on any of the charges?" The court initially thought that the jury might be indicating that it was hung on all counts, and called the jury into the courtroom to inquire. The foreperson indicated that the jury was not hung, and that the question posed to the court was a "hypothetical question." When asked by the court, "So you're not really telling me the jury is hopelessly deadlocked," the foreperson indicated the jury was not hopelessly deadlocked. The court instructed the jury not to send out "hypothetical questions" and asked the jury whether it still wanted the readback of the testimony of the two witnesses that it had yet to receive. The foreman indicated that the jury still wanted to hear the readback of that testimony. The trial court then sent the jury back to the jury room for further deliberations.

Later that day, the jury sent the court the following question, identified in the record as "Juror Question #4": "Why are there multiple counts for one offense? For example, counts 18-23 the crime of committing a lewd or lascivious act on a child under the age of 14 against Jane Doe 2. [¶] Why are there 4 oral copulations with a child 10 years of age or younger for Jane Doe 2?"[8] In the courtroom, outside the presence of the jury, the court stated, "Before we went on the record, I was informally advising counsel that what I am thinking -- and I am thinking out loud[,] [a]nd I will certainly hear suggestion from counsel -- is to finish the readbacks tonight, send them home, and bring them in [tomorrow]." The court suggested that it would "give each side whatever time you need, five minutes to half an hour, minimum five minutes; maximum half an hour," to "[c]ontinue and redo your closing arguments and explain to them that it is multiple acts apparently alleged, number of acts alleged; and that [each charge] go[es] to each act." The court then said to the attorneys, "But if you have other suggestions, I [will] listen." The attorneys and the court proceeded to discuss possible options for responding to the jury's question, including responding in writing or directing the jury to specific jury instructions. The attorneys and the court indicated confusion as to why the jury seemed not to comprehend what the attorneys and court believed was a fairly basic point, and they struggled with how to respond.[9] Ultimately, the trial court offered the following suggestion:

---

[8] Counts 14 through 17 alleged that Barber orally copulated a child 10 years old or younger with respect to Jane Doe 2.

[9] For example, defense counsel stated at one point, "I don't -- and I don't-- and I am not sure if this is just one person asking this. Why are they asking this? I am sorry. I am just a little taken aback by the question." Later, the court expressed concern about how this particular question did not seem to fit into the typical framework of jury questions, which usually involve either a

"I am willing to give each of you five minutes. I can do it. But it is not my job to do it. I, this afternoon, I can bring them right here. You stand up. I give [the prosecutor] five minutes. And I give [defense counsel] five minutes. Explain to them. Just in plain English as you're teaching a three-year-old. Just say each count, you heard evidence that it could have happened hundred times, or three times, or one time. The D.A. has elected only th[is] many time[s], [this] many counts, th[is] many times. And then you can stand up and you say the D.A. didn't prove any of them. [¶] But I don't think it is my job to be giving it to them in terms of – because it's, you're right [defense counsel]. If I want to repeat the law, I will refer them to that instruction. Each count is a separate crime. But because they are stuck and they are stuck in a very fundamental way, I am willing to give you five minutes."

Neither attorney objected to the trial court's suggestion. The bailiff then notified the court that the readbacks were completed. Because defense counsel had previously indicated that she was unavailable to do additional closing argument the following day, the court brought the jury into the courtroom for further argument that same day.

The prosecutor proceeded first and presented a chart that the prosecution had used during the original closing arguments. The chart set out all of the charges against appellant visually. The prosecutor's argument was brief, taking up only one and a half pages of reporter's transcript. The prosecutor explained that each charge related to a separate alleged act, and told the jury that if the jury found that Barber had committed the same type of conduct on multiple occasions, it could find Barber guilty of multiple counts related to those findings.

_____

legal question or a factual question, stating: "This one is beyond that. This one is a total lack of comprehension. Because this should be self-evident. It should be absolutely self-evident."

41

Defense counsel's additional closing argument also consists of approximately one and a half pages of reporter's transcript. Defense counsel did not directly address the jury's question; instead, defense counsel argued that Barber had not committed any of the alleged acts. Counsel began by stating: "Good afternoon, once again, ladies and gentlemen. Doesn't matter how many times they claimed it happened. It doesn't matter how many counts there were. The law told you that you are not supposed to count the number of witnesses, and that the allegations are not evidence. [¶] What we know in this case is that it's not true, and it can't be true. Not only did you see them be interviewed at length and tell you in their own words, it did not happen, you now have several subsequent interviews and testimony that conflict with their own selves [*sic*]. [¶] . . . This is all Johnny-come-lately stuff when we find out grandpa is about to get out of prison." At that point, the trial court asked defense counsel to "please limit yourself to answering [the jury's] question, if possible." Defense counsel then reiterated to the jury that all conflicts in the evidence should be resolved in Barber's favor, and that any doubt required a "not guilty" finding. Defense counsel also reminded the jury of the unanimity requirement: "So not only does the prosecutor have to prove that an act, a specific act happened that matches a count, all twelve of you have to agree as to specifically what it was in that time frame. So you can't all say well, maybe it all happened one time, but I think it was this, and I think it was this, I think it was that. You all have to agree exactly what the act was that would fit the count." Defense counsel then asked the jury to "do [its] duty" and "return a not guilty verdict.

Upon the conclusion of defense counsel's additional closing argument, the trial court asked the jury foreperson whether the additional closing arguments had "help[ed] in any way to answer [the jury's] question." The

foreperson indicated they had. When the court posed a general question to the jurors regarding whether "[e]verybody agrees," several jurors "answer[ed] in the affirmative." However, Juror No. 7 asked the court the following question: "I guess the question also was as to the counts [that] were listed -- and I don't remember the numbers right offhand, but 14, 15, 16, 17, I don't recall it saying this one was because it was oral. This one was because it was -- it didn't say all of the details that it was saying there as to which one it was. I think that is --[.]" At that point the court interrupted and said, "This[,] what you just saw was a closing argument. It is not evidence. We did that to help you." Juror No. 7 stated, "Okay," but Juror No. 9 then said, "I am hoping I can say this. I mean but we kind of looked at those four oral [copulation counts] and said well, maybe that was -- did it happen two times in the bed and two times in the car. And that is not what we were talking about though; right? We don't want to do it that way?" The court responded as follows:

> "Okay. Here is the problem. You have the law. You have the jury instructions. I think you're on the right track, sir. Just follow the track.
>
> "The simplest way I can answer your question is if you believe an act of oral copulation, for example, happened, if you believe it happened, that is one act. If you believe another act happened, that is another count. The D.A. chose to charge four counts of those instead of one hundred twenty, or one.
>
> "Does that explain it?"

When Juror No. 9 indicated a need for further clarification, the trial court explained that the location of the act was irrelevant and said, "[B]eyond that, I cannot give you additional information." The court reiterated that the jury's determination as to any particular count had to be unanimous,

43

clarifying again that "[a]ll twelve of you must agree as to one act."  Because it was late in the day, at the conclusion of this discussion, the court sent the jurors home.

The jury continued deliberating on Thursday, June 17, and requested readback of additional testimony.  At close to 2:00 p.m. on Friday, June 18, the jury advised the trial court that it had reached unanimous verdicts on 21 counts, but was deadlocked on 2 counts.  The court inquired of the foreperson about the jury's determination that it could not reach verdicts on two counts and then inquired of the full jury.  After doing so, the court declared a mistrial on those two counts.  The court then read the jury's verdicts on the remaining 21 counts and polled the jury.

2.  *Analysis*

Barber contends that the trial court abused its discretion in allowing the parties to reopen their closing arguments when the jury had not indicated that it had reached an impasse in its deliberations at the time it sent the court Juror Question #4.  Barber relies on the fact that under California Rule of Court, rule 2.1036 (rule 2.1036), a trial court is authorized to reopen argument only after a jury has reported that it is at an impasse.  The full text of rule 2.1036 states:

> "(a) Determination
>
> "After a jury reports that it has reached an impasse in its deliberations, the trial judge may, in the presence of counsel, advise the jury of its duty to decide the case based on the evidence while keeping an open mind and talking about the evidence with each other.  The judge should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict.
>
> "(b) Possible further action

44

"If the trial judge determines that further action might assist the jury in reaching a verdict, the judge may:

"(1) Give additional instructions;

"(2) Clarify previous instructions;

"(3) Permit attorneys to make additional closing arguments;

"or

"(4) Employ any combination of these measures."

The rule grants a trial court discretion in "choosing whether to resort to the tools provided" in rule 2.1036; its decision is reviewed for an abuse of that discretion. (*People v. Salazar* (2014) 227 Cal.App.4th 1078, 1088.)

According to Barber, when the jury submitted Juror Question # 4, it was not reporting that it was at an impasse as to any of the charged counts, but instead was simply asking the court to answer a question. Thus, Barber contends, the trial court did not have discretion under rule 2.1036 to reopen argument in response to the jury's question.

### a. *Barber forfeited this contention by failing to register an objection to the reopening of closing arguments*

The People contend that Barber has forfeited his contention regarding the reopening of closing arguments by failing to register any objection to this method of addressing the jury's question. As previously noted, a defendant's failure to make a timely and specific objection on a ground raised on appeal results in forfeiture of an argument based on that ground of error. (See, e.g., *Demetrulias, supra*, 39 Cal.4th at pp. 20-22, *Partida, supra*, 37 Cal.4th at pp. 433-434.)

45

The record demonstrates that defense counsel did not object to the trial court's suggestion to allow both parties to present additional closing argument to the jury in response to the jury's question regarding why "there [are] multiple counts for one offense." Barber suggests that the fact that his attorney at one point offered a suggestion that the court provide a written response to the jury's question should be considered to be an objection to the court's ultimate determination that it would reopen closing arguments. We disagree. The court specifically elicited "suggestion[s]" from both attorneys during the on-the-record discussion regarding Juror Question #4. At that time, defense counsel offered only, "My suggestion would be to apply the facts from the trial to the counts," and then proceeded to make the comment questioning why the jury was "asking this" and remarking that she was "taken aback by the question." She also mentioned that she had doctor appointments the following day, which meant that she "can't reargue tomorrow." Rather than indicating that she objected to the possibility of reopening the arguments, counsel appeared to be open to that suggestion but had a concern regarding when she would be able to present further argument. In response to defense counsel's concern about being unavailable the following day, the prosecutor offered, "Could we try to possibly clarify with something in writing, and then if that doesn't clarify it, then --." Before the prosecutor finished her sentence, the court asked "How do I propose it?" Neither of the attorneys offered phrasing to the court. At some point, the court stated, "This question defies logic. I am sorry. But that is how I feel after --," and defense counsel added, "I agree. That is why I am struggling with a response Your Honor." The court then suggested that it would give each attorney "five minutes" for further argument. Defense counsel at no point objected to this proposal or indicated any disagreement with the court's

46

approach on the ground that the jury did not appear to be at an impasse. Thus, defense counsel did not put the court on notice that she believed the court should not permit the parties to present additional argument in response to the jury's question. Barber's appellate contention that the court abused its discretion in this respect is therefore forfeited.

            b. *Barber cannot demonstrate ineffective assistance of counsel*

In order to avoid the effects of the forfeiture of his appellate argument by the failure to object on this basis in the trial court, Barber contends that his trial attorney's failure to object constituted ineffective assistance of counsel. We conclude that Barber has failed to demonstrate that he is entitled to reversal of his convictions on the basis of his ineffective assistance of counsel claim with respect to the reopening of closing arguments.

We apply the same standards for assessing a claim of ineffective assistance of counsel set forth in part III.A.2.b.ii.B, *ante*, to Barber's contention that his attorney was ineffective for failing to object to the reopening of closing arguments. We therefore consider whether Barber has demonstrated both that trial counsel's performance was deficient, and that this deficient performance resulted in prejudice. (*Strickland, supra*, 466 U.S. at p. 687.)

We conclude that Barber is unable to satisfy either prong of an ineffective assistance of counsel claim. First, as to counsel's performance, we begin by noting that there is rarely only a single reasonable strategy for a defense attorney to adopt when representing a client in a criminal case. The fact that other strategies might exist, or might appear in hindsight to have possibly had a better chance at success, does not make the strategy employed by trial counsel unreasonable or render counsel's performance deficient. (See *Maryland v. Kulbicki* (2015) 577 U.S. 1, 4; *People v. Jennings* (1991)

53 Cal.3d 334, 379–380.)  In this instance, deciding the best approach for the defense with respect to addressing the jury's question was inherently a tactical decision.  Defense counsel could have reasonably concluded that even though the jury had not indicated that it was at an impasse, the court's proposal to reopen closing argument would be beneficial to the defense because it would allow counsel another opportunity to try to convince the jury of the defense's view of the case.  And this is precisely what counsel did with the opportunity.  Thus, there *is* a conceivable reason for trial counsel's decision not to object to the court's decision to reopen closing arguments.

In addition, Barber cannot demonstrate that counsel's failure to object to the court reopening closing arguments in response to the jury's question about the number of counts prejudiced him.  Barber has not even attempted to set out an argument as to how there is a reasonable probability that, but for counsel's failure to object to the reopening of arguments, the result of the proceeding would have been different.  (See *Strickland, supra*, 466 U.S. at p. 694.)  The trial court had to respond in some fashion to the jury's inquiry, and at some point the jury would have been re-instructed that each count was intended to reflect a different alleged act.  This is, effectively, what the prosecutor's additional closing argument did, as the prosecutor stated:  "The important thing to know is that each act is a separate count.  So, if for example during the timeframe we know that it could have possibly happened, oral copulation, hundreds of time[s], we could have charged a separate count for each act," and later explained, "[W]e could have charged hundreds.  But we have narrowed it down."  Thus, the additional closing argument by the prosecutor did not include rearguing the evidence or focusing the jury's attention on particular evidence; the prosecutor merely tried to address a very basic point, raised by the jury, that the court and attorneys believed

48

should have been clear to the jury from the start. The defense, in contrast, reargued the evidence, and reasserted and highlighted to the jury that all jurors would have to be unanimous in finding that a particular act of sexual misconduct occurred with respect to any count.

Barber contends, however, that defense counsel was prevented from "pointing out the inconsistencies in the girls' stories" because the trial court "interrupted and imposed its own objection." He asserts that this permitted the prosecutor to "highlight to the jury again [Jane Doe 1] and [Jane Doe 2]'s testimony and present their testimony as entirely truthful without any challenge from defense counsel." This mischaracterizes what occurred. First, the prosecutor did not "highlight" any of the witness testimony. Instead, the prosecutor merely explained, using a chart, that each count was intended to relate to a separate alleged act of sexual misconduct. Further, defense counsel took the opportunity to reargue that the witnesses had made inconsistent statements and that the only reason they came up with their stories was because of Barber's impending release from prison. Thus, contrary to Barber's contention on appeal, the additional argument presented by the attorneys cannot reasonably be viewed as having "coerced [the juror's] guilty verdicts." Nor did the trial court take any action or make any statements that could be seen as coercing a verdict; the court did not question jurors on their views, urge jurors to reach agreement, or indicate a preference for a particular verdict. Rather, the court provided both sides a very brief opportunity to present additional closing argument. We therefore conclude that there is not a reasonable probability that an objection from defense counsel to the court's proposal to reopen closing arguments, even assuming that the court would have decided not to allow further argument from counsel, would have resulted in a different outcome for Barber.

49

In sum, Barber has not demonstrated that defense counsel's failure to object to the trial court's proposal to reopen arguments fell below an objective standard of reasonableness *or* that there is a reasonable probability that, but for counsel's allegedly deficient performance, the result of the trial would have been different. (*Strickland, supra*, 466 U.S. at pp. 686-687.)

## IV.

## DISPOSITION

The judgment is affirmed.


AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

BUCHANAN, J.